**IN THE SUPREME COURT OF THE STATE OF IDAHO**

**Docket No. 34723**

| | | |
|---|---|---|
| **MICHELLE DANTI,** | ) | |
| | ) | |
| **Plaintiff-Respondent,** | ) | **Boise, January 2009 Term** |
| | ) | |
| **v.** | ) | **2009 Opinion No. 39** |
| | ) | |
| **EDWARD DANTI,** | ) | **Filed: March 5, 2009** |
| | ) | |
| **Defendant-Appellant.** | ) | **Stephen W. Kenyon, Clerk** |
| _____ | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Honorable Russell A. Comstock, Magistrate Judge.

Judgment and Decree of Divorce is <u>affirmed</u>.

Edward Danti, Meridian, appellant pro se.

Ludwig, Shoufler, Miller, LLP, Boise, for respondent. Bret W. Shoufler argued.

_____

J. JONES, Justice

Ed Danti appeals the divorce decree entered between himself and his ex-wife, Michelle Danti, particularly challenging the provisions awarding Michelle sole physical custody of their two children and allowing her to relocate with the children to California. We affirm.

**I.**

Ed and Michelle were married in California in 1996. During their marriage, the couple had two daughters – one in 1998 and the other in 2004. At the time of the proceedings in this matter, the children were eight and two years old, respectively.

Ed and Michelle lived in California until 2004. While there, Ed ran a residential remodeling company and Michelle owned and operated her own day care. They decided to move to Meridian, Idaho, in July 2004. Their plan was to stay in Idaho for a few years and then possibly relocate to California. Once the family arrived in Idaho, Ed began his own custom tile business and Michelle stayed at home with the children.

1

In August 2005, Ed hired a designer, Heather Clark, to assist him with some of his remodeling projects. Approximately one month after Ed hired Heather, he and Michelle began considering divorce. Michelle was unhappy living in Idaho and the couple fought frequently. Although no definitive resolution was reached, the couple decided to temporarily separate. During their period of separation, Ed continued to live in the couple's home.

Shortly after Ed and Michelle decided to separate, Michelle learned from Heather's husband that Ed was likely having an affair with Heather.[1] Michelle confronted Ed with this information and he admitted having an emotional connection to Heather, but denied any sexual relationship. Over time, however, Ed's romantic feelings for Heather grew. When Ed eventually told Michelle of his feelings for Heather, Michelle informed him that she wanted to move back to California but she agreed not to leave until Ed returned from a trip he was taking to California. In return, Ed agreed to allow Michelle to move to California with the children once he arrived back in Idaho. The written agreement, which was signed by Ed, stated: "I am going to California, by myself, Fri. Nov. 4 thru Sun Nov. 6 – Michelle agrees not to go to California wh[ile] I'm gone. When I get back on Sunday, Michelle & I will talk and after we talk if she still feels she needs to go to California, I will let her go with [our daughters]."[2]

Once Ed returned from his trip, Michelle decided to move back to California. Thereafter, Michelle and the children returned to California, but continued to have daily conversations with Ed. During the course of those conversations, Ed was able to convince Michelle to come back to Idaho. Michelle agreed to return after Ed promised that he would end both his personal and professional relationships with Heather.

Once Michelle arrived back in Idaho, she began to suspect that Ed was still seeing Heather.[3] By December 2005, it became obvious to Michelle that, despite his promise, Ed was continuing his relationship with Heather. Consequently, Michelle informed Ed that she planned to return to California. Ed then signed another consent letter giving Michelle his permission to permanently move to California with the children. Before Michelle was able to leave, however, Ed broke down and begged her not to go. Once again, he promised Michelle that if she stayed

---

[1] At the time, Heather and her husband were going through a contested divorced.

[2] Although Ed claimed that he was going to California by himself, he actually went with Heather.

[3] Michelle became suspicious when she learned that Heather and Ed were still working together and observed Heather sitting outside of the couple's home talking on her cell phone while Ed was upstairs also talking on the phone.

with him he would end his relationship with Heather. Ed's promise persuaded Michelle and the couple decided to return to California together.

While in California, Michelle learned that Ed was still having regular communications with Heather. Michelle confronted Ed about the communications and he admitted that he had been in touch with Heather. After the confrontation, Ed decided to fly back to Idaho. Once here, he continued to try to convince Michelle to reconcile with him by denying any sexual relationship with Heather.

Ed ultimately persuaded Michelle to move back to Idaho. After returning, Michelle observed Heather at one of Ed's jobsites. This angered Michelle, who decided to call Heather and request a meeting. Michelle then went to Heather's house and the two women discussed their relationships with Ed. Perhaps unsurprisingly, Michelle and Heather discovered that Ed had been lying to both of them. In the midst of their conversation, Ed arrived and admitted that he had been sexually intimate with both women. Upon learning this information, Michelle became upset and left Ed at Heather's house. Although Ed went home briefly that night to pack his belongings, he ended up spending the night with Heather.

The next morning Ed went home to apologize to Michelle. After Ed arrived, however, the couple began arguing and Ed "became enraged and grabbed Michelle by the arms, pushing her up against the laundry room door while screaming at her and poking her in the chest with his finger." All of this occurred in front of the couple's youngest daughter. When Michelle was finally able to break free from Ed, she took her daughter and went to the police station. Michelle reported the incident to the police and Ed was charged with domestic battery. A no contact order was issued and Ed subsequently pleaded guilty to the lesser charge of disturbing the peace. After the issuance of the no contact order, Ed moved in with Heather because he could no longer live in the same house as Michelle.

In March 2006, Michelle filed a complaint for divorce against Ed, in which she alleged irreconcilable differences, adultery, and extreme cruelty. A temporary custody order was issued in May 2006, granting Michelle primary physical custody of the children. The order conditioned Ed's visitation with the children on him not living with Heather and on Heather not being present during visitation. It also required Ed to pay Michelle sixty percent of his net income.

Over the next few months, the intensity of the conflict between Michelle and Ed increased. On more than one occasion, the parties filed police reports alleging that the other had

3

committed various crimes. Additionally, the police were called during at least one custody exchange. At several other exchanges, the couple argued in front of their daughters about topics ranging from the children's involvement in extracurricular activities to visitation schedules and missing clothing.

A trial regarding the divorce, child custody, and child support was held on December 15, 2006. After the trial, the court granted Michelle's request for a divorce on the grounds of extreme mental cruelty and adultery. The judge awarded Ed and Michelle joint legal custody of the couple's children, but granted Michelle sole physical custody.[4] As part of the custody arrangement, Michelle would be permitted to move to California with the children and Ed would receive visitation with the girls in Idaho during portions of their winter, spring, and summer breaks. Ed would also be allowed to visit the girls in the Sacramento, California, area once per month and on certain holidays. Because Michelle would have the children the majority of the time, Ed was ordered to pay $885.00 per month in child support. The court, however, granted Ed permission to deduct $200.00 per month from his support obligation for travel expenses related to his visitation in California.

Ed now appeals to this Court. He alleges that the court's award of sole physical custody to Michelle was an abuse of discretion because it: (1) violated Idaho's presumption in favor of joint custody; (2) was not in the best interests of the children; (3) was improperly based on Michelle's status as the children's primary caregiver; (4) disregarded Michelle's numerous acts of "secretly and wrongfully" taking the children out of the state; (5) was based on clearly erroneous findings of fact; and (6) was not based upon a custody evaluation performed by a neutral third party.[5] He also argues that the award was improper because the visitation schedule was unfair, his attorney was ineffective, the judge was biased against him, it violates his constitutional rights, and the court erroneously ignored Michelle's mishandling of community and separate property. For these reasons, he asks this Court to reverse the custody award, order the children returned to Idaho, and award him physical custody. Michelle, on the other hand,

---

[4] The couple negotiated a settlement regarding the division of their property.

[5] On appeal, Ed also challenges the court's temporary custody order, denial of his motion to modify the temporary order, and summer 2007 visitation schedule. Because the court's temporary orders were superseded by the judgment and decree of divorce, Ed's challenges to those orders are untimely. Accordingly, we will not address Ed's arguments relating to the temporary orders. *See Nelson v. Nelson*, 144 Idaho 710, 714, 170 P.3d 375, 379 (2007) (declining to address challenges to superseded orders on appeal because such challenges are "neither timely nor appropriate").

maintains that the custody award was proper and seeks an award of attorney fees and costs on appeal.

## II.

On appeal we are concerned with several issues including whether: (1) the magistrate judge's custody award was an abuse of discretion; (2) the visitation schedule was an abuse of discretion; (3) the custody award should be vacated on the grounds that Ed's attorney was ineffective; (4) the custody award was the result of the trial court's bias against Ed; (5) the custody award violates Ed's constitutional right to the custody, care, and control of his children; (6) the court improperly ignored Michelle's alleged mishandling of community and separate property; and (7) Michelle is entitled to an award of attorney fees.

### A.

Child custody determinations are committed to the sound discretion of the magistrate judge. *McGriff v. McGriff*, 140 Idaho 642, 645, 99 P.3d 111, 114 (2004). On appeal, this Court will overturn a magistrate's custody decision only if it is an abuse of discretion. *Roberts v. Roberts*, 138 Idaho 401, 403, 64 P.3d 327, 329 (2003). A custody award will not be regarded as an abuse of discretion so long as the trial court: (1) recognized the issue as one of discretion; (2) acted within the outer limits of its discretion and consistently with the legal standards applicable to the available choices; and (3) reached its decision through an exercise of reason. *Id*.

On the other hand, a trial court abuses its discretion when it makes a custody award based on evidence that is insufficient to conclude that the award is in the child's best interest. *Nelson v. Nelson*, 144 Idaho 710, 713, 170 P.3d 375, 378 (2007). A magistrate's findings of fact, however, will be upheld if they are supported by substantial and competent evidence and are not clearly erroneous. *Reed v. Reed,* 137 Idaho 53, 56, 44 P.3d 1108, 1111 (2002). Evidence is substantial "if a reasonable trier of fact would accept it and rely upon it in determining whether a disputed point of fact has been proven." *King v. King,* 137 Idaho 438, 442, 50 P.3d 453, 457 (2002). When reviewing a magistrate's findings of fact, we view the evidence in favor of the magistrate's judgment and will uphold the magistrate's findings even if there is conflicting evidence. *Nelson,* 144 Idaho at 713, 170 P.3d at 378. We will not make credibility determinations or replace the trial court's factual findings by reweighing the evidence. *Id.*

**B.**

Ed argues that the magistrate abused his discretion by awarding Michelle sole physical custody of the children and allowing her to return with them to California. He asserts that the decision was an abuse of discretion because it was based on erroneous conclusions of law and factual findings that were not supported by substantial and competent evidence. Michelle maintains that the magistrate's conclusions were in accordance with Idaho law and that the factual findings were supported by substantial and competent evidence.

In Idaho, the children's best interests are of paramount importance when making decisions regarding the children's custody, including decisions relating to where the children will reside. *Hoskinson v. Hoskinson,* 139 Idaho 448, 455, 80 P.3d 1049, 1056 (2003); *Roberts,* 138 Idaho at 404-05, 64 P.3d at 330-31. Idaho Code section 32-717 provides that: a "court may, before and after judgment, give such direction for the custody, care and education of the children of the marriage as may seem necessary or proper in the best interests of the children." I.C. § 32-717(1). In determining what is in the children's best interests, courts are required to consider all relevant factors. *Id.* Relevant factors may include, but are not limited to: the parents' wishes for the children's custody; the children's wishes; the interrelationship and interaction between the children and their parents and siblings; the extent the children have adjusted to their school, home, and community; the character and circumstances of the persons involved; the need to promote continuity and stability in the children's lives; and domestic violence. I.C. § 32-717(1)(a)-(g). Additionally, unless one parent is a habitual perpetrator of domestic violence, courts are required to apply Idaho's presumption that an award of joint custody is in the children's best interests. I.C. § 32-717B(1), (4) & (5); *see also Hopper v. Hopper,* 144 Idaho 624, 626, 167 P.3d 761, 763 (2007). An award of joint custody must provide "that physical custody . . . be shared by the parents in such a way as to assure the . . . children [have] frequent and continuing contact with both parents." I.C. § 32-717B(1). The court may make an award of joint physical custody,[6] joint legal custody,[7] or both. *Id.*

---

[6] "Joint physical custody" means "an order awarding each of the parents significant periods of time in which a child resides with or is under the care and supervision of each of the parents or parties." I.C. § 32-717B(2). Such an award requires that "custody . . . be shared by the parents in such a way to assure the child a frequent and continuing contact with both parents." *Id*.

[7] "Joint legal custody" means "a judicial determination that the parents or parties are required to share the decision-making rights, responsibilities and authority relating to the health, education and general welfare of a child or children." I.C. § 32-717B(3).

Since the children's best interests are the paramount consideration, a court may decline to award joint custody if doing so will serve the children's best interests. I.C. § 32-717B(4). The record, however, must contain evidence overcoming the joint custody presumption. The court must, in addition, "state in its decision the reasons for denial of an award of joint custody." I.C. § 32-717B(1). These considerations apply where a parent wishes to relocate with his or her child. An award of physical custody to a relocating parent may only be made if he or she proves that the move is in the children's best interests.[8] *Roberts,* 138 Idaho at 405, 64 P.3d at 331.

**1.**

The trial court did not abuse its discretion by awarding Michelle sole physical custody of the children. The court recognized the issue before it as one of discretion, acted within the bounds of its discretion and consistently with legal standards, and reached its decision through an exercise of reason. In its decision, the court noted that its "decision regarding [the] custody of minor children is discretionary." It went on to acknowledge that it was required to evaluate the evidence presented in light of Idaho Code section 32-717 and the joint custody presumption contained in section 32-717B. The court then meticulously analyzed each of the section 32-717 factors and applied them to the evidence before it. Only after its thorough consideration of the children's best interests did the court decide to award sole physical custody to Michelle and it clearly stated the reasons for so doing.

Several of the section 32-717 factors played only a slight role in the court's analysis. More specifically, the court concluded that the children's wishes, parents' wishes, and domestic violence were of little consequence. In regards to the children's wishes, the youngest child's wishes were unknown and the oldest child had only expressed her desire to live with her mother on one occasion. Accordingly, their wishes were only given slight weight in the court's analysis. The parents' wishes for the children's custody also had little bearing on the court's decision. The court gave due regard to the parents' wishes but, because they were conflicting, concluded that they did not favor awarding custody to one parent over the other. Finally, domestic violence was of little concern to the court because there was no established pattern of violent behavior by either party. Rather, there was only one occasion of reported violence committed by Ed.

---

[8] The joint custody presumption may be overcome by a preponderance of the evidence. I.C. § 32-717B(4).

Because there was no evidence of habitual domestic violence, the court also concluded that the presumption in favor of joint custody applied.[9]

Of more importance to the court was its concern for continuity and stability in the children's lives. The court concluded that this factor favored awarding physical custody to Michelle. It reasoned that in light of the children's young age they "gain security from a stable environment in which their needs are consistently met." Because Michelle had served as the children's primary caregiver their entire lives and was "best able to meet their physical and psychological needs consistently," she would be more likely to further these objectives. At the same time, the children's need for stability weighed against awarding physical custody to Ed because "he inappropriately involved the children directly in his conflict with Michelle by denigrating her character to them."

Ed disputes the trial court's reliance on Michelle's status as the children's primary caregiver in making its custody award. In doing so, he attempts to analogize the facts of this case to the facts in *Hopper v. Hopper*, 144 Idaho 624, 167 P.3d 761 (2007). In *Hopper*, the trial court awarded a mother temporary custody after she secretly moved to Montana with her son and obtained a fraudulent domestic violence protection order against the father. *Id*. at 625, 167 P.3d at 762. In its temporary order, the court permitted the mother to stay in Montana with the child. *Id*. On appeal, we held that the magistrate erred by allowing the child to stay in Montana during the custody proceedings. *Id.* at 627, 167 P.3d at 764. We reasoned that allowing the child to stay in Montana would reward the mother for her unlawful conduct. *Id*. Because the mother violated the law by absconding with the child and filing a false protection order, she should not have received the evidentiary benefits associated with being awarded temporary custody. *Id*. Accordingly, we remanded the case to be "decided with the underlying legal and social principle that it is [in] the best interests of a child to have a continuing relationship with both parents." *Id*.

Ed's attempt to analogize the facts of this case to those in *Hopper* is unpersuasive. Unlike the domestic violence claim in *Hopper*, Michelle's claim has not subsequently been determined to be false. Although Ed points to facts that, if true, would tend to undermine

---

[9] In his briefs on appeal, Ed spends considerable time contesting the alleged domestic violence incident and his resulting guilty plea. Because the trial court did not rely on domestic violence in making its award, however, Ed's challenges are of slight significance.

Michelle's claim,[10] there was also evidence to support the court's conclusion that Ed was violent with Michelle. The court had before it a police report describing the event, Ed's guilty plea, and Michelle's testimony. Moreover, the trial court specifically found Michelle's account of the event that gave rise to the domestic battery charge more credible.[11] Because this Court will not second-guess the trial court's judgment relating to the credibility of witnesses or reweigh conflicting evidence on appeal, we reject Ed's argument that Michelle's domestic violence claim was false. *See Nelson,* 144 Idaho at 713, 170 P.3d at 378.

This case is also distinguishable from *Hopper* because Michelle did not secrete the children from Ed. Unlike the mother in *Hopper* who secretly moved with the child to Montana, Michelle moved to California with the children only after informing Ed and, on two occasions, obtaining his written consent. Nonetheless, Ed attempts to characterize Michelle's moves to California with the children as "kidnapping" and "extortion." He argues that Michelle secretly left Idaho and "fled" to California, then refused to return unless he agreed not to divorce her. He maintains that Michelle forced him to sign the letters in which he consented to the moves by threatening to leave with the children while he was out of town.

Ed's arguments regarding Michelle's moves are unconvincing. The fact that Ed signed written consent statements giving Michelle permission to return to California with the couple's daughters undermines his claim that the moves were secret.[12] On the one occasion that Michelle returned to California without obtaining Ed's written consent, he was aware of her plan to move. Moreover, the trial court implicitly found Ed's assertions that the letters were signed under duress to lack credibility. For these reasons, Ed's claim that Michelle repeatedly kidnapped and secreted the children is without merit.

Next, the trial court found that the interrelationship between the children and their parents favored awarding physical custody to Michelle. Although the evidence indicated that the children were close to both parents, digital telephone recordings submitted by the parties

---

[10] Ed claims that he was at work during the alleged incident and points out that there was no physical evidence indicating that he was violent with Michelle.

[11] The court explicitly stated that its findings of fact were "based on the testimony and evidence that the court determined to be the most credible." It then included Michelle's version of the domestic violence incident in its findings.

[12] It also undermines his claim that Michelle committed child custody interference in violation of Idaho Code section 18-4506.

9

revealed that Michelle had a more constructive relationship with the children.[13]  The recordings also revealed that Michelle was "more reasonable and solution-oriented than Ed."

Finally, an award of physical custody to Michelle was supported by the court's analysis of the character of the parties involved.   In analyzing this factor, the court acknowledged that both Ed and Michelle demonstrated character flaws throughout the proceedings.  However, it concluded that, in light of Ed's behavior, Michelle's self-restraint was "fairly remarkable."[14]  Digital recordings of conversations and custody exchanges revealed that Ed made several inappropriate comments to the children and to others in their presence.  Further, Ed's affair with Heather reflected poorly on his character.  Not only did Ed begin a sexual relationship with Heather while still married to Michelle, he tried to rationalize to his eight-year-old daughter the relationship with Heather and the fact that he was having a baby out of wedlock.  In the view of the court, this behavior indicated that Ed would not be a positive role model for his daughters.  In all, the court concluded that instead of focusing on the needs of the children, Ed "focus[ed] . . . on Ed and what [he] deserve[d] from his children."

After reviewing the magistrate judge's decision, it is clear that the judge did not err in awarding Michelle sole physical custody of the children.  Only after analyzing all of the relevant factors and fully explaining the basis for its decision did the court conclude that awarding Michelle sole physical custody was in the children's best interests.  Consequently, it concluded

---

[13] In the recordings, Michelle was "positive and encouraging" when preparing the children for visitation, while Ed was often "condescending, dictatorial and confrontational."  Additionally, the recordings revealed that Ed had "poor impulse control, an alarming lack of insight into how his behavior affected [his older daughter] and an inappropriate manner of attempting to manipulate [her] feelings."  In one conversation with his eight-year-old daughter, Ed stated:

> Do you want me out of your life?  Do you want me out of your life completely?  Do you want me just to spend my time with [your sister] and not to care what I do with you?  Is that what you want, because that's where I'm going, that's what I'm gonna start doing, I'm gonna start just doing stuff with [your sister], taking [her] places, buying things for [her] and I'm not going to do anything with you anymore, because that was really hurtful and mean and rude, for you and your mommy to [inaudible] this, and I know this comes from your mommy, and you know what, I'm gonna bring it up in court against your mommy.

Ed was apparently upset that his daughter finished working on a school project with Michelle rather than with him.  Other recordings reveal Ed "chastis[ing] [his daughter] for not calling him when he directed her to" and for going to movies with her mother.

[14] Although Ed acknowledges that the trial court made findings of fact regarding Michelle's faults, he argues that it failed to adequately consider them in reaching its conclusions of law.  He points out that Michelle had on occasion interfered with his visitation, tried to induce him to violate the no contact order, and her friend was caught stalking Heather.  The magistrate's findings of fact, however, indicate that the court did adequately consider Michelle's role in the couple's dispute.  It merely determined that Ed's conduct was more inappropriate and had a negative impact on the children.

10

that an award of joint physical custody would not be in the children's best interests and, therefore, that the presumption in favor of joint custody had been overcome.

Nevertheless, Ed argues that the court's decision was an abuse of discretion because it disregarded Idaho's joint custody presumption and his right to child custody established by Idaho Code section 32-1007. Both of Ed's arguments are unpersuasive.

Ed's argument that awarding sole physical custody to Michelle violates Idaho's joint custody presumption misconstrues the law. The joint custody presumption is just that – a presumption. *See* I.C. § 32-717B(4). Unlike *per se* rules, presumptions may be overcome. *Id*. In this case, the magistrate concluded that the presumption had been overcome by evidence indicating that an award of joint physical custody was not in the children's best interests.[15] Accordingly, Ed's argument that the court abused its discretion by disregarding the joint custody presumption is unconvincing.

Similarly, Ed's reliance on Idaho Code section 32-1007 is unfounded. That provision equally entitles parents to their children's custody, services, and earnings. I.C. § 32-1007. If one parent dies, is unable to take custody, refuses custody, or abandons the family, however, the other parent is entitled the children's custody, services, and earnings. *Id*. Relying on this provision, Ed argues that he should have been awarded physical custody of his children because he is not dead, unable to take custody, unwilling to take custody, or guilty of abandonment.

Ed's assertion that section 32-1007 sets forth an exclusive set of circumstances under which a parent will not be awarded physical custody ignores the canon of statutory construction requiring statutes relating to the same subject matter, or statutes *in pari materia*, to be "construed together to effect legislative intent." *Paolini v. Albertson's Inc.*, 143 Idaho 547, 549, 149 P.3d 822, 824 (2006) (quoting *City of Sandpoint v. Sandpoint Indep. Highway Dist.*, 139 Idaho 65, 69, 72 P.3d 905, 909 (2003)). Construing section 32-1007 as Ed suggests would disregard section 32-717's requirement that courts consider all relevant factors in making custody awards. *See* I.C. § 32-717(1); *cf. Hopper*, 144 Idaho at 627, 167 P.3d at 764 (stating that "[n]one of the

---

[15] Contrary to Ed's assertion, finding that the non-custodial parent is a habitual perpetrator of domestic violence is not the only way to overcome the joint custody presumption. The presumption may be rebutted, regardless of domestic violence, when the court concludes that joint custody is not in the children's best interests. *See* I.C. § 32-717B(4); *cf. Hopper*, 144 Idaho at 626, 167 P.3d at 763 (stating that the joint custody presumption "can be overcome if a parent is found by the court to be a habitual perpetrator of domestic violence"). Moreover, when the court finds that one parent is a habitual perpetrator of domestic violence, it is presumed that joint custody is not in the children's best interests. *See* I.C. § 32-717B(5).

conditions that would cause a loss of equal custody rights defined in I.C. § 32-1007 exists i[n] this case," but then going on to analyze the best interest factors contained in section 32-717 to determine whether a sole physical custody award was lawful). It would also disregard the discretion section 32-717B(2) gives magistrates deciding how much time children will spend with each parent and its provision allowing sole custody awards when such awards are in the children's best interests. Finally, the interpretation Ed suggests ignores section 32-717B's presumption against an award of joint custody when one parent is a habitual perpetrator of domestic violence. *See* I.C. § 32-717B(5). For these reasons, section 32-1007 does not establish an exclusive set of conditions for awarding one parent sole physical custody and Ed has failed to show that the custody award violated section 32-1007.

In sum, because the court concluded that an award of sole physical custody to Michelle was in the children's best interests and, therefore, that the joint custody presumption had been overcome, the custody award was not an abuse of discretion.

**2.**

Nor did the court abuse its discretion in allowing Michelle to move with the children to California. Relying on this Court's opinion in *Weiland v. Ruppel*, 139 Idaho 122, 75 P.3d 176 (2003), the court weighed the benefits the children would receive from moving against the benefits of having more regular contact with Ed. After doing so, it concluded that the benefits of having more contact with Ed were "far outweighed by other considerations." The court reasoned that living in close proximity to Ed would potentially result in the children living in a perpetual high-conflict environment. Not only would the children be exposed to Ed's and Michelle's arguments, but also to Heather's high-conflict divorce. The only way to avoid exposing the children to numerous dysfunctional relationships would be to allow them to move with their mother to California. Additional benefits the children would receive if allowed to move included: increased emotional support, the opportunity to be around their extended family, increased stability, and "a psychologically healthier environment." Moreover, the children would not experience much disruption from the move since they had spent significant periods of time in California while Michelle and Ed were separated. The couple's oldest daughter had even

12

been enrolled in school there. In light of these considerations, the court determined that it was in the children's best interests to relocate to California with their mother.[16]

Ed argues that the trial court abused its discretion by not considering the move-related factors approved by this Court in *Roberts v. Roberts*, 138 Idaho 401, 64 P.3d 327 (2003). However, Ed's argument misconceives the law. In *Roberts*, this Court upheld the trial court's decision to consider factors relied upon in other jurisdictions in deciding whether a mother could relocate with her children. *Id*. at 405, 64 P.3d at 331. Specifically, the trial court considered factors enumerated by the New York Court of Appeals in *Tropea v. Tropea*, 665 N.E.2d 145 (N.Y. 1996). Those factors included the parents' motives for relocating or opposing relocation; the quality of relationship between both parents and the child; the child's attachment to both parents; the negative impact of the child's exposure to continued hostility between the parents; the extent the move would enhance the economic, emotional, and educational well-being of the custodial parent and the child; the quality of the child's lifestyle if the relocation was allowed or denied; the effect of the move on the child's relationship with extended family members; and the likelihood that suitable visitation arrangements could preserve the child's relationship with the non-custodial parent. *Tropea*, 665 N.E.2d at 151.

Ed's argument that the trial court erred by failing to consider the *Tropea* factors is flawed for two reasons. First, as this Court recently held in *Bartosz v. Jones*, 146 Idaho 449, 197 P.3d 310 (2008), courts are free to consider factors not enumerated in section 32-717, but are not required to do so. *Id*. at 456, 197 P.3d at 317 ("Factors relevant in some relocation cases may be irrelevant in others and, under the current framework, trial courts are free to consider factors unique to each case."). Thus, in making its custody award, the trial court was not obligated to consider the *Tropea* factors if it did not regard those factors as relevant. *See id*.; *see also* I.C. § 32-717. Second, the magistrate did consider several, if not all, of the *Tropea* factors in reaching its decision. It considered Michelle's motive for moving, the quality of the children's relationships with both Ed and Michelle, the children's bond with each parent, the negative

---

[16] Ed argues that the court's custody award was based on what the court thought was in Michelle's best interest. In making this argument, he points to the court's statement that "[i]f Michelle was not allowed to move, the children's primary caregiver would be forced to stay in Idaho where (i) her husband took her to improve his business, (ii) her husband left her for another woman and (iii) she has no family or meaningful support." After reviewing the court's entire opinion, however, it is clear that the court's primary concern was the children's best interests – not Michelle's. Moreover, the subjects of the statements Ed challenges, while discussed in the context of Michelle, would also have an impact on the children.

13

impact exposure to continued hostility between Ed and Michelle would have on the children, the extent a move to California would enhance the emotional and financial well-being of Michelle and the children, the extent the move would enhance the children's relationships with extended family, and the feasibility of visitation between the children and Ed.

Because the magistrate concluded that Michelle had met her burden of proving that moving to California was in the children's best interests, it did not abuse its discretion by allowing Michelle to relocate. Ed's arguments to the contrary are unpersuasive.

**3.**

Finally, the magistrate did not abuse his discretion by basing the custody award on clearly erroneous factual findings. Although Ed challenges several of the magistrate's factual findings, he failed to include the transcript from the custody trial in the record on appeal and, therefore, has not provided this Court with the necessary basis for determining whether the magistrate's findings of fact were supported by the evidence.[17] Consequently, we will presume that the magistrate's factual findings were supported by substantial and competent evidence. *See Fritts v. Liddle & Moeller Constr., Inc.*, 144 Idaho 171, 174, 158 P.3d 947, 950 (2007). Because the trial court's conclusions of law were justified by its factual findings, which in turn were presumptively supported by substantial and competent evidence, its order granting Michelle sole physical custody and allowing her to return to California was not an abuse of discretion.[18]

**C.**

Ed contests the trial court's visitation schedule on the grounds that it will be "impossible to maintain over the next 14 years." Ed also disputes the schedule because he is not reimbursed for all of his travel expenses, he does not have visitation on certain holidays and other "special days," and it requires him to leave his new wife and child eighteen times per year.

The establishment of a visitation schedule is a matter within the trial court's sound discretion. *Nelson v. Nelson*, 144 Idaho 710, 716, 170 P.3d 375, 381 (2007). Like child custody

---

[17] For the same reason, it is impossible for us to review Ed's claims that Michelle committed perjury, conspired to commit perjury, and suborned perjury. *See Fritts v. Liddle & Moeller Constr., Inc.*, 144 Idaho 171, 174, 158 P.3d 947, 950 (2007).

[18] Contrary to Ed's assertion, the magistrate's custody award was not an abuse of discretion simply because it was not based on a custody evaluation conducted by a neutral third party. *See generally Bartosz*, 146 Idaho 149, 197 P.3d 310 (upholding custody order that was contrary to recommendation in the custody evaluation).

determinations, visitation schedules must be guided by a concern for the child's best interest. *Id*.; *McGriff v. McGriff*, 140 Idaho 642, 652, 99 P.3d 111, 121 (2004). In determining a visitation schedule, magistrates should attempt to "provide[] a satisfactory basis for preserving and fostering the child's relationship with the noncustodial parent." 27C C.J.S. *Divorce* § 1017; *see also Vogel v. Vogel*, 637 N.W.2d 611, 620 (Neb. 2002). They should also, however, take into account the convenience of the parties. 27C C.J.S. *Divorce* § 1017. Additionally, when parties are unable to agree on the times and places for visitation, trial courts may be required to "spell out a very detailed schedule of visitation." *Ziegler v. Ziegler*, 107 Idaho 527, 535, 691 P.2d 773, 781 (Ct. App. 1985); *see also Nelson*, 144 Idaho at 717, 170 P.3d at 382.

Ed has failed to show that the trial court's visitation schedule was an abuse of discretion. In establishing the visitation schedule, the court considered the children's best interests, the parties' need for structure, transportation costs, and the convenience of the parties. Based on these considerations, the court awarded Ed extended visitation with the children in Idaho during their breaks from school, visitation in California once per month and during certain holiday weekends, and regular "virtual visitation" through the use of "telephone, Internet, web-cam, and other wireless or wired technologies." Although the court acknowledged that there may be easier and more cost efficient ways to accomplish visitation, it concluded that Michelle and Ed could not "be counted on to cooperate to that extent." Moreover, the court's visitation schedule was necessary to avoid "placing [the] children in limbo at or during exchanges."

The fact that the court decided not to allow Ed to deduct all of his transportation costs from his support obligation does not render the visitation schedule an abuse of discretion. In an effort to minimize the economic impact visitation would have on Ed, the court allowed him to deduct travel expenses from his monthly child support obligation. Specifically, Ed was permitted to reduce his support obligation by $200.00 per month – the approximate cost of gas and wear and tear to his vehicle resulting from his trips to California. The deduction did not include the cost of room and board because the court assumed that Ed could stay with his family in California. In calculating the deduction, the court acknowledged that Ed may not think it was fair, but concluded that it was the most workable solution. According to the court, ordering the parties to share travel expenses pro rata or by some other formula "would require [them] to regularly provide [each] other with documentation and information, which has already been the

15

source of litigation in this case and would likely continue to be." In light of the evidence before the court, its decision to permit a $200.00 per month deduction was not an abuse of discretion.

Nor did the court abuse its discretion by declining to award Ed visitation during *every* holiday or "special day." Ed was awarded visitation every other Christmas and Thanksgiving. He was also awarded visitation every spring break, Memorial Day weekend, and Fourth of July. In addition to in-person visitation, the schedule allows Ed to call the children once per week and have "virtual visitation" with them twice per week. Because the visitation schedule adequately ensures that the children's relationship with Ed will be fostered, the fact that it did not award Ed visitation on certain holidays and "special days" does not render it an abuse of discretion.

Similarly, the visitation schedule was not an abuse of discretion simply because it requires Ed to spend approximately one weekend per month away from his new wife and son. In issuing the visitation schedule, the trial court could have reasonably concluded that it would be more convenient for Ed to travel to California over the weekend than it would be for the children to travel to Idaho. Additionally, in light of Ed's accusations that the trial court was only concerned with Michelle's best interest, it is paradoxical that he now asks this Court to consider the fairness of requiring him to spend weekends away from his new family in order to visit his daughters in California. Moreover, his complaint about being away from his family in Idaho contradicts his assertion that he should be awarded additional visitation with the children on certain "special days" in California. In sum, Ed has not shown that requiring him to travel to California in order to visit his daughters was an abuse of discretion.

Since the trial court thoroughly considered the children's best interests, the convenience of the parents, the parties' need for structure, and the costs of travel in establishing the visitation schedule, the schedule was not an abuse of discretion. If the visitation schedule does become impossible to follow, as Ed alleges it will, he may seek a modification to the schedule at that time. *See Biggers v. Biggers*, 103 Idaho 550, 555, 650 P.2d 692, 697 (1982).

## D.

Ed argues that his first attorney inadequately represented him throughout the custody proceedings.[19] He asserts that the representation was inadequate due to his attorney's alcohol

---

[19] Ed also argues that his attorney improperly advised him to plead guilty to the charge stemming from the domestic violence incident. Such an argument, however, should have been made in a challenge to the guilty plea itself. Moreover, the validity of the guilty plea has slight relevance to the proceedings in this case since the trial court placed little emphasis on domestic violence in reaching its decision.

and chemical dependency problems. As a result of the addiction problems, Ed argues that his attorney passed out before a scheduled deposition, was late and failed to appear at several court proceedings, failed to subpoena witnesses, failed to schedule a home study, did not follow through on a motion to stay the custody order, and was generally unprepared. Because the trial court was purportedly aware of these facts, Ed argues that it should have declared a mistrial.

It is a well-settled rule in Idaho that the negligence, mistakes, or unskillfulness of counsel do not provide a basis for setting aside a civil judgment. *Donovan v. Miller,* 12 Idaho 600, 605-06, 88 P. 82, 83 (1906); *see also Esser Elec. v. Lost River Ballistics Techs., Inc.*, 145 Idaho 912, 917, 188 P.3d 854, 859 (2008). Since civil litigants voluntarily choose their attorneys, "[t]he fault in [ineffective representation] cases is attributed to the party himself." *Donovan,* 12 Idaho at 606, 88 P. at 83. Under this rule, litigants in such cases will not be able to avoid the consequences of their attorneys' mistakes. *Goodman v. Lothrop*, 143 Idaho 622, 627, 151 P.3d 818, 823 (2007).

Although Ed's attorney may have provided inadequate representation, his attorney's deficiencies do not serve as a basis for reversing the child custody award. Rather than seeking reversal on appeal, Ed should have fired his attorney, sued him for malpractice, or filed a complaint with the state bar. Because Ed voluntarily chose to be represented by that attorney throughout the entirety of the child custody proceedings, he cannot now rely on the attorney's deficient performance as grounds for setting aside the custody award. Thus, the trial court did not err by refusing to grant a mistrial even though it may have had knowledge of his attorney's dependency problems.[20]

**E.**

Next, Ed argues that the custody proceedings were tainted by the judge's bias and prejudice against him. In arguing that the judge was biased, Ed relies on the fact that nearly all of the judge's rulings were in Michelle's favor. Ed also relies on two of the judge's alleged statements that he claims indicated bias. Specifically, Ed claims that the judge stated that adultery was his "personal pet peeve" and that he was "offended at the sound of [Ed's] voice

---

[20] Ed also contends that the judge should have allowed his new attorney to revisit the child custody issues. However, Ed's new attorney began representing him after the trial court had already ruled on the child custody issue and only served as his attorney during the property disposition proceedings. Moreover, Ed did not even request that the custody issue be revisited until he filed an untimely motion for a new trial approximately seven months after the court entered its judgment.

having a tone of being wronged." According to Ed, these statements prove that the judge was biased against him.

Despite Ed's claims, we must presume that the magistrate was not biased or prejudiced against Ed. The record reflects that on October 1, 2007, Ed filed an "Affidavit . . . In Support of Motion for Disqualification for Cause," however, Ed's actual motion for disqualification and the magistrate's ruling on the motion are not included in the record. Consequently, this Court has no way to review the magistrate's disqualification ruling, or even to know what the ruling was. *See Fritts*, 144 Idaho at 174, 158 P.3d at 950. Moreover, without a transcript, it is impossible to determine whether the judge made the challenged statements and, if so, to review the statements in context. *Id*. Because Ed has failed to provide the Court with an adequate basis to review the judge's disqualification ruling, we will presume that the trial court did not err in reaching its decision. *Id*.

<h1 style="text-align:center">F.</h1>

Ed argues that the magistrate's custody award violates his constitutionally protected parental rights. He maintains that, because he was awarded joint legal custody, he should be allowed to take his children out of the Sacramento area during his California visitation. Ed asserts that the restriction limiting his California visitation to the Sacramento area violates his constitutional right to the "care, custody, and control of [his] children" as pronounced by the United States Supreme Court in *Troxel v. Granville*, 530 U.S. 57, 66 (2000).

Ed's constitutional argument is unpersuasive. Initially, it mischaracterizes the rights associated with an award of joint legal custody. Ed's award of joint legal custody gave him the right to share in decision-making regarding his children's health, education, and general welfare. *See* I.C. § 32-717B(3). It did not give him the right to take the children wherever he pleases during visitation. Moreover, the award did not violate Ed's constitutional right to the custody, care, and control of his children. As we recently held in *Bartosz*, a child custody decision that implicates a parent's constitutional rights will be upheld so long as the decision was necessary to ensure the child's best interest. *Bartosz*, 146 Idaho at 463, 197 P.3d at 324. Here, the magistrate determined that moving to California with Michelle and having monthly visitation with Ed was in the children's best interests. A custody award implementing that arrangement was therefore necessary to serve the children's best interests. Further, a specific, rigid visitation arrangement was necessary in light of, among other things, the parties' demonstrated inability to work with

flexibility. Because the custody award was necessary to ensure the children's best interests, it did not violate Ed's constitutional right to the custody, care, and control of his children.

**G.**

Ed also makes several challenges relating to Michelle's treatment of the community and separate property. First, he challenges Michelle's act of falling behind on house payments and thereby letting the community home slip into foreclosure. Second, he challenges her decision to leave outstanding balances on utility bills that were in his name. Third, he argues that she improperly sold, gave away, and withheld various items of his personal property including: his business laptop, tools, guns, and other personal items. According to Ed, Michelle's withholding of his property resulted in him being unable to provide the court with photographic evidence of the close relationship he had with his daughters.

Ed's arguments regarding Michelle's treatment of the community and separate property do not warrant much consideration. On appeal, Ed does not challenge the property distribution or request that the provisions of the divorce decree relating to the division of property be overturned.[21] Rather, Ed merely refers to Michelle's treatment of the property in an effort to show that the judge, in allowing her behavior, was prejudiced against him. As discussed above, however, Ed has failed to submit an adequate record for this Court to consider his claims of judicial bias and prejudice.

The only argument Ed makes, regarding the mishandling of property, that is of concern to this appeal is his assertion that Michelle retained pictures in an effort to preclude him from proving the bond he had with his daughters. However, in light of the trial court's acknowledgment that Ed had a close relationship with both of his daughters, it is clear that the lack of photographic evidence was of little import to the court in reaching its decision.

For the foregoing reasons, Ed's claims regarding Michelle's handling of property lack merit. If Michelle is still in possession of certain property in violation of the settlement agreement and divorce decree, Ed should have filed a motion for contempt rather than challenging her actions on appeal.

---

[21] Moreover, Ed's arguments relate to Michelle's handling of property before the parties entered into a settlement agreement regarding the distribution of their property. Ed has not included a copy of the settlement agreement in the record and, therefore, it is impossible to determine whether the claims Ed raises on appeal were settled by the parties. In any event, the distribution schedule attached to the judgment and decree of divorce awarded Ed tools, copies of the family's pictures, and several other personal items. The decree also divided the couple's debts.

## H.

Michelle requests an award of costs and attorney fees under Idaho Code section 12-121 and Idaho Appellate Rule 11.1.[22] She argues that Ed's arguments on appeal were nothing more than an invitation for this Court to second-guess the trial court's findings of fact. Ed maintains that Michelle should not be awarded fees because he did not bring the appeal frivolously, unreasonably, and without foundation.

Under Idaho Code section 12-121, a court may award attorney fees to the prevailing party in a civil action. I.C. § 12-121; *see also Nelson*, 144 Idaho at 717, 170 P.3d at 382. An award of fees pursuant to this section may only be made "when the court is left with the abiding belief that the appeal was brought, pursued or defended frivolously, unreasonably and without foundation." *Nelson*, 144 Idaho at 718, 170 P.3d at 383 (quoting *Balderson v. Balderson*, 127 Idaho 48, 54, 896 P.2d 956, 962 (1995) (internal quotations omitted)); *see also* Idaho R. Civ. P. 54(e)(1). Such is the case when an appellant has only asked the appellate court to second-guess the trial court by reweighing the evidence or has failed to show that the trial court incorrectly applied well-established law. *Nelson*, 144 Idaho at 718, 170 P.3d at 383. Conversely, fees generally will not be awarded when the "losing party brought the appeal in good faith and where a genuine issue of law was presented." *Id*.

Additionally, Idaho Appellate Rule 11.1 directs courts to impose sanctions on parties who "violate the certification that they made when signing a notice of appeal." *Fowble v. Snoline Express, Inc*., 146 Idaho 70, 77, 190 P.3d 889, 896 (2008). Parties violate their certification when they sign and file a document that is not "well grounded in fact [or] . . . warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." Idaho App. R. 11.1. However, sanctions are generally not appropriate unless there is "a showing that the appeal was brought for an improper purpose." *Chavez v. Barrus*, 146 Idaho 212, 226, 192 P.3d 1036, 1050 (2008). Sanctions for violating the certification may include "an order to pay to the other party . . . the amount of the reasonable expenses incurred because of the filing of the notice of appeal . . . including a reasonable attorney's fee." Idaho App. R. 11.1.

---

[22] Michelle also requests an award of fees pursuant to Idaho Appellate Rule 41. However, we have previously held that Rule 41 only "specifies the procedure for requesting an award of attorney fees on appeal" – it does not serve as substantive authority for awarding fees. *Athay v. Stacey*, 146 Idaho 407, 422, 196 P.3d 325, 340 (2008) (quoting *Gilman v. Davis*, 138 Idaho 599, 603, 67 P.3d 78, 82 (2003)).

Michelle is not entitled to an award of fees under section 12-121 or Rule 11.1.  An award of fees under section 12-121 would be improper because Ed did not bring his appeal frivolously, unreasonably, or without foundation.  Instead, he raised legitimate questions of law relating to the standard governing relocation cases in Idaho.  Rule 11.1 is also inapplicable because Michelle has failed to present any facts indicating that Ed brought the appeal for an improper purpose.  Thus, Michelle is not entitled to fees on appeal.

## III.

The Judgment and Decree of Divorce is affirmed.  Michelle is awarded costs on appeal but no attorney fees.

Justices BURDICK, W. JONES, and HORTON, and Justice Pro Tem TROUT CONCUR.