## IN THE SUPREME COURT OF THE STATE OF IDAHO

### Docket No. 53588

JENNIFER FAITH BICKERSTAFF, )
)
  Petitioner-Respondent, )
)
v. )
)
RYAN MARTIN BICKERSTAFF, )
)
  Respondent-Appellant. )
)
)

Boise, April 2026 Term

Opinion Filed: May 8, 2026

Melanie Gagnepain, Clerk

Appeal from the Magistrate Court of the Fourth Judicial District of the State of Idaho, Ada County. Matthew Haynes, Magistrate Judge.

The decision of the magistrate court is <u>affirmed</u>.

Gravis Law, PLLC, Boise, and Beard St. Clair Gaffney, PA., Idaho Falls for Appellant. Charles B. Bauer argued.

Goss Gustavel Goss, PLLC, Boise, and Cosho Humphrey, LLP, Boise, for Respondent. Mackenzie E. Whatcott argued.

_____

BRODY, Justice.

This is an expedited, permissive appeal of a child custody judgment permitting relocation of the parties' minor children. Appellant Ryan Martin Bickerstaff and Respondent Jennifer Faith Bickerstaff were married and have two minor children. Following a three-day trial in their divorce proceeding, the magistrate court entered a judgment awarding Ryan and Jennifer joint legal and physical custody of the children and permitting Jennifer to relocate with the children from Eagle, Idaho, to Winter Park, Florida.

On appeal, Ryan argues that the magistrate court abused its discretion by permitting the relocation, asserting that the court based its decision on an erroneous finding that Ryan would also move to Florida, failed to adequately weigh factors favoring the children remaining in Idaho, and misapplied Idaho law governing relocation and joint custody. He also contends the record does not

support a finding that relocation is in the children's best interests, particularly given the evidence of their stability and success in Idaho. For the reasons discussed below, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The parties' background, marriage, and birth of first child

Ryan and Jennifer met in May 2013, while they were both living in California and working for Intuit. They began dating in June 2014 and were married approximately one year later, on June 28, 2015.

Neither Ryan nor Jennifer were originally from California. Ryan grew up in a small town in Oklahoma. He moved to California to attend Stanford University, where he obtained a bachelor's degree in electrical engineering and a master's degree in management science and engineering. Jennifer was born in Massachusetts and lived there the majority of her early childhood. Her family moved to Miami, Florida, in 2001 and then to Winter Park, Florida, which is just north of Orlando, in 2004. After attending and graduating from high school in Winter Park, Jennifer briefly moved to Pennsylvania to attend college at Eastern University. Just a few weeks into the school year, she experienced a health issue that required her to drop out and move back to Winter Park for the remainder of the year. She subsequently attended William and Mary College, where she obtained a degree in marketing. Following graduation, she was hired by Intuit and worked in their Woodland Hills, San Francisco, and Mountain View, California, offices.

Both before and during their marriage, Ryan and Jennifer regularly traveled to Winter Park, Florida, where Jennifer's parents, grandmother, and friends still reside. They made the trip five times between 2014 and 2018, the first time so that Jennifer could introduce Ryan to her family and friends, another time so that Ryan could participate in an Ironman competition, and the remaining times for holidays and family celebrations. During their visits, Ryan and Jennifer stayed at Jennifer's parents' house in Winter Park or at her parents' beach condominium in the nearby town of Ponce Inlet.

In March 2019, while the parties were still living in California, Jennifer gave birth to their first child, RMB. Ryan and Jennifer were still working at Intuit at the time, but they staggered their parental leave so that each of them was able to care for and bond with RMB after her birth. Jennifer traveled to Florida with RMB when RMB was approximately six months old. A few months later, both Jennifer and Ryan traveled to Florida with RMB to celebrate Thanksgiving with Jennifer's family.

2

**B.  Marital difficulties and relocation to Idaho**

Ryan and Jennifer began having marital difficulties in the fall of 2020. At the time, California was experiencing a number of wildfires, one of which was close to the city of Mountain View, where the parties were living. While Ryan was out of town attending a funeral for his grandmother, Jennifer learned that other towns near Mountain View were being evacuated. Jennifer was anxious about the fires, and she called Ryan and told him that she wanted to leave their residence and take RMB to a friend's house in San Diego. Ryan told Jennifer that she could not leave with RMB and that, if she did, he would call the police and accuse her of kidnapping. Jennifer stayed at the residence with RMB, but when Ryan returned, Jennifer insisted that they work on their marriage. Shortly thereafter, the couple began counseling sessions with their church pastor.

In the summer of 2021, Ryan, Jennifer, RMB, and Ryan's mother all traveled to Florida for a two-week vacation. They spent the first week at Jennifer's parents' condominium in Ponce Inlet and the second week at the Winter Park residence celebrating the Fourth of July with Jennifer's friends and family.

At some point after RMB was born, Ryan and Jennifer decided that they did not want to live in California for the long term. They agreed they would like to relocate before RMB started kindergarten, and they considered a number of cities and states they believed may provide the quality of life they were seeking. Winter Park was one of the cities they considered.

Fortuitously, before the parties made a decision as to where they would like to relocate, Intuit offered to promote Jennifer to vice president in charge of its Eagle, Idaho, office. Jennifer accepted the promotion, and the parties moved to Meridian, Idaho, in December 2021. Ryan also continued to work for Intuit, albeit remotely. Aside from one individual Jennifer had been friends with as a young girl, neither she nor Ryan knew anyone in Idaho when they moved here.

Jennifer's new position proved extremely stressful for her. She worked long hours and faced significant pressure to improve the performance of Intuit's struggling Eagle office. When she confided in Ryan about her difficulties at work, he was not as supportive as Jennifer hoped he would be. He reminded her that they had moved to Idaho for her new job and gave her the impression that if she failed at work, she was also failing their family. The situation caused Jennifer extreme anxiety and depression. In April 2022, she "bottomed out" and spent two nights at Cottonwood Creek Behavioral Hospital, an experience she later described as a "wakeup call."

Following that incident, Jennifer prioritized her mental, physical, and spiritual well-being, began working with a psychiatrist for medication management, and regularly attended counseling. She also spent more time with Ryan and RMB, including taking another trip with them to Winter Park in June 2022. Jennifer has not had any significant issues with her mental health since.

## C. Escalation of marital conflict and Jennifer's safety concerns

Although the parties' relationship briefly improved after Jennifer's hospital stay, their marital difficulties resurfaced in the summer and fall of 2023. They had purchased a house in Eagle and were making upgrades and improvements to the home. Ryan was working with the contractors, which caused him significant stress. Throughout this period, Ryan and Jennifer had frequent arguments, during which Ryan would often yell at Jennifer. He also became upset when Jennfier, who was pregnant with their second child at the time, asked for assistance with or resisted doing chores that were difficult for her.

In the fall of 2023, Ryan's position at Intuit was eliminated. As their second child was due in early 2024, Ryan and Jennifer decided that Ryan would not seek new employment and would instead focus on caring for the children while Jennifer continued to work. Ryan took a severance package with the intent to be a stay-at-home dad for a year and a half and then reassess his employment situation.

In mid-October 2023, the parties' marital difficulties escalated. Jennifer was scheduled to attend a work conference in Las Vegas, and she and Ryan had previously decided that Ryan would accompany her so they could spend some time away together before the new baby was born. Given the state of their relationship, Jennifer told Ryan that she wanted to go without him and a heated argument ensued. When Jennifer left the room to get away from the conflict, Ryan followed her to the kitchen and blocked her path. Once she was able to get past him, she ran to another room and locked the door. RMB was in the house at the time and heard the parties fighting.

A few days later, Ryan and Jennifer had another disagreement. While they were lying in bed, Ryan informed Jennifer that he had been researching divorce and custody laws, and he alternated between being angry at Jennfier and angry at himself. During this same discussion, he compared their situation to that of one of Jennifer's former coworkers who earlier that year had shot his wife and then killed himself. Jennifer had been traumatized by that event, and she perceived Ryan's reference to it as threatening.

4

Around the time of these events, Jennifer became increasingly concerned with Ryan's behavior and began to feel unsafe. At Jennifer's request, her father traveled from Winter Park and stayed with the parties in their home for a period of time in late October. After his arrival, Ryan stopped yelling at Jennifer during their disagreements.

In December 2023, Jennifer observed what she described as "a continued trajectory of . . . inappropriate behavior" on Ryan's part. On one occasion, Jennifer observed Ryan with an erection while he was laying down and holding RMB on his chest or lap. When Ryan made a comment about it, Jennifer told him that his behavior was not appropriate, but Ryan said she was "crazy" or just "reading into it." According to Jennifer, similar incidents occurred on two more occasions.

**D. Birth of second child, Jennifer's unilateral relocation to Florida, and abuse allegations**

On January 30, 2024, Jennifer gave birth to the parties' second child, KFB. At that time, the couple's marriage was continuing to deteriorate and Ryan told Jennifer that, if they divorced, she would be stuck in Idaho forever. Jennifer did not feel like she and the children were safe. During a six-week follow-up visit with her obstetrician, Jennifer told the doctor about some of the issues in her marriage and explained to him that she was fearful for her and the children's safety. Jennifer explained that her family would soon be visiting to attend KFB's baptism. When she asked the doctor whether he thought she should enlist her family's help to leave the situation or wait it out a few more weeks, the doctor suggested that she pack her bags and go.

KFB was baptized on March 17, 2024, and both Ryan's and Jennifer's friends and family were in town to attend the celebration. The day after the baptism, Jennifer told Ryan that she was going to brunch with the children, but she actually got on a flight with her mother and took the children to Winter Park, where they stayed for several weeks. While in Winter Park, Jennifer reached out to Faces of Hope in Idaho and was told that she was required by law to report concerns of abuse. Around the same time, she disclosed to her father and several other individuals that, before they were married, Ryan admitted that he had viewed child pornography. She also shared her observations of Ryan's conduct with RMB in December 2023.

Between March 2024 and July 2025, Jennifer made roughly fifteen allegations of child abuse to the Idaho Department of Health and Welfare. The law enforcement investigations that followed included a CARES forensic interview and a sexual assault examination of RMB. Following the investigations, law enforcement found no evidence of sexual contact between Ryan and RMB. All of the abuse allegations were ultimately screened out or closed as unsubstantiated.

**E. Divorce filings, temporary orders, and Parenting Time Evaluation**

On March 29, 2024, Jennifer filed a petition for divorce, and in a separate case she filed for and obtained a civil protection order to prohibit Ryan from having any contact with her or the children ("the CPO case"). On April 3, 2024, before he was served with Jennifer's divorce petition, Ryan filed his own petition for injunctive relief, immediate return of the children, and legal separation. Ryan's family law petition was consolidated into Jennifer's divorce action on April 5, 2024. Ryan later filed an answer and counterpetition in the consolidated cases.

At a hearing on May 16, 2024, the parties stipulated on the record that Jennifer would dismiss the CPO case, return with the children to Idaho, and have exclusive use of the marital residence during the pendency of the divorce action. They also stipulated to a Parenting Time Evaluation ("PTE") and agreed to a "stay away order" requiring that any communication between them be through a parenting application. On May 24, 2024, the magistrate court entered temporary orders incorporating the terms of the parties' agreement and also gave Jennifer primary custody of the children, with Ryan having a weekly rotating schedule of supervised visitation. The court also ordered a PTE to be conducted by the parties' evaluator of choice, Dr. James Davidson.

On November 27, 2024, the court entered amended temporary orders changing Ryan's supervised visitation schedule, addressing custody exchange issues, addressing counseling for RMB, allowing Jennifer to take the children to Florida for a visit, and ordering Ryan not to use a portion of the greenbelt that went by the parties' marital residence. By the time the magistrate court entered its amended temporary orders, Jennifer had lost her position with Intuit as a result of the closure of its Eagle, Idaho, office in October 2024, and she was seeking to permanently relocate with the children to Winter Park, Florida.

The PTE was completed and filed with the magistrate court on March 2, 2025. With the parties' assent, Dr. James Davidson prepared the report with the assistance of his wife, Dr. Nancy Davidson (hereafter collectively "Dr. Davidson"). In forming his opinions, Dr. Davidson reviewed hundreds of documents, conducted numerous interviews (including of the parties, their children, and the parties' extended family and friends), and made home visits at the parties' residences in Idaho. He also visited Jennifer's parents' house in Winter Park.

In the PTE, Dr. Davidson raised concerns about the number of child abuse allegations Jennifer had leveled at Ryan and, in particular, her persistence in advancing the abuse narrative to other individuals even after the allegations were investigated and ruled unsubstantiated. He also

6

raised a concern regarding Ryan's tendency to portray Jennifer as having significant mental and emotional problems, despite a lack of objective evidence to support that characterization. Despite these concerns, Dr. Davidson found that Jennifer and Ryan are both of generally good character and that each parent's mental health is within normal limits and appropriate for parenting.

Dr. Davidson also found that Ryan and Jennifer are both capable and attentive parents and that each of them meets their children's physical, emotional, and cognitive needs. He observed that the children are bonded to both parents, interact positively with each of them, and are well-adjusted in both households. RMB, in particular, was doing well academically and socially, demonstrating above-average performance in school, maintaining friendships, and participating in activities through school, church, extended family, and extracurricular involvement. He further determined that both parents provide stability and continuity in the children's lives, that neither faces a financial limitation affecting their ability to parent, and that there is no evidence of domestic violence. Overall, Dr. Davidson concluded that neither parent has a comparative advantage in custodial fitness.

With respect to relocation, Dr. Davidson considered the competing proposals—Jennifer's desire to move to Winter Park, Florida, and Ryan's desire to remain in the Boise area—and evaluated the relative advantages of each location. Ultimately, he opined that the children should be allowed to relocate to Winter Park. Among the reasons he cited in support of this recommendation were that "[t]he children's adjustment to their home will be reduced with the father and improved with the mother," "[t]he children's adjustment to their school is viewed as better in Winter Park," and Winter Park would allow Jennifer to "return[] to a community in which she has some social support, a larger range of medical and behavioral health treatment providers, better opportunities for her . . . ultimate return to work, and a sense of security for herself and the children," with the "latter factor [being] significant."

As to custody, Dr. Davidson found no basis to limit either parent's time with the children. He noted that, although Jennifer historically exercised more parenting time, both parents are competent, the children are bonded to both, and there is no objective support for awarding either parent sole legal or physical custody. He therefore recommended joint legal and physical custody, with equal parenting time if both parents reside in the same state. If Jennifer relocates to Florida and Ryan remains in Idaho, Dr. Davidson recommended that Ryan be afforded significant parenting time during the summer and holidays.

7

## F. Trial and the magistrate court's relocation and custody decision

The child custody and relocation matters proceeded to a three-day trial in September 2025. Dr. James Davidson testified during Jennifer's case-in-chief, and the PTE he prepared was admitted into evidence over Ryan's objection. During his testimony, Dr. Davidson reiterated his recommendation that Ryan and Jennifer have joint legal and physical custody of their minor children. However, he tempered his recommendation regarding relocation, stating that, while the court "could" find in favor of permitting Jennifer to relocate with the children to Florida, the question of whether the court "should" do so was a "very close call" and could go either way. When pressed on cross-examination regarding the relocation issue, Dr. Davidson testified:

> This is a challenging case where I think the honest and most transparent thing to do is to say, this is a challenging case in this area. . . . [T]here was some seesaw back and forth in trying to arrive at our conclusions.
>
> . . . .
>
> On the relocation issue . . . . [i]t's not inappropriate to say, hmm, this is the dilemma, and 49/51, 50/50. Your Honor has more information than we have in conducting this evaluation, and . . . Your Honor has legal expertise beyond my legal working knowledge to do this evaluation.
>
> This is probably going to have to be one where the judge is truly going to have to heavily weigh everything, like he always would, but in this case with the guidance as far as we can take it.

During her testimony, Jennifer explained that she wanted to relocate with the children to Winter Park because "that's the place where we have a center of gravity of family and friends that we don't have anywhere else in the world." She testified that, when she took the children to Winter Park after KFB's baptism, she was not trying to cut Ryan out of their lives. Rather, her intent was to work on her marriage from a distance in a place of stability and safety, where she and the children had family and friends for support. Although Jennifer originally sought sole primary and physical custody of the children, she testified that she no longer believed that was in the children's best interests. She accepted that the abuse allegations she had made against Ryan were all found to be unsubstantiated, and she wanted to move on and co-parent with Ryan for the children's benefit. To that end, she requested that she and Ryan be granted joint legal and physical custody, that she be permitted to relocate with the children to Winter Park, and that the parties follow a 50/50 custody schedule if Ryan also relocated to Florida. She proposed an alternate custody schedule if Ryan elected not to relocate to Florida, in which event she testified she would do everything she could to keep him as involved in the children's lives as he wanted to be.

8

Jennifer testified that, while she would stay in Idaho with her children if the court denied her relocation request, she believed that moving to Winter Park was in children's best interests. She acknowledged that RMB—then six years old—and KFB—then nineteen and a half months old—had a "very good" relationship with Ryan and were "thriving" in Idaho, but she was confident they would also thrive in Florida where they would be surrounded by a network of family and friends. She testified that, if they moved to Winter Park, she and the children would reside with her parents and would have an entire floor of the residence to themselves. She anticipated that RMB, who was then in first grade, would attend The Geneva School, which is comparable in quality and curriculum to the Galileo STEM Academy that RMB was then attending in Idaho. She also testified and presented evidence that the entire family would have access to a broader range of healthcare facilities in the Orlando area. In addition, although both parties had substantial assets and were not financially dependent on immediate employment, Jennifer testified that she intended to return to work once KFB was older and that, given her connections, employment opportunities would be better in Florida both for herself and for Ryan.

Ryan testified that he opposed Jennifer's request to relocate the children. He advocated that the parties have joint legal and physical custody of the children if they both resided in Idaho or that he be awarded primary physical custody if Jennifer chose to relocate without the children. He testified that both he and the children were thriving in Idaho, emphasizing the children's involvement in school, friendships, church, and extracurricular activities. He described himself as closely bonded with both children and actively involved in their daily lives, noting that he lived approximately ten minutes from RMB's school and regularly walked RMB there during his parenting time. He also testified to his own involvement in the children's school and church communities and presented witnesses in support of his community ties.

Ryan questioned Jennifer's motivations for seeking relocation, was concerned she was perpetuating falsehoods about him to numerous individuals, and expressed skepticism that her family would be supportive of him going forward. He adamantly denied the abuse allegations that had been raised against him and also denied having ever knowingly viewed child pornography. Finally, Ryan testified that, although he did not want to move to Florida, he could not see how he would have any other choice but to do so if the court granted Jennifer's relocation request, as he could not envision maintaining his relationship with the children from a distance.

Following trial, the magistrate court issued detailed findings of fact and conclusions of law granting Jennifer's relocation request. The court evaluated all relevant statutory factors and considered the evidence presented by both parties, including evidence that each parent would either remain in Idaho or relocate to Florida, depending on the outcome. The court expressly recognized that the relocation decision was a close case, but it ultimately concluded that Jennifer met her burden of proving that relocation to Winter Park was in the children's best interests.

The court entered a partial judgment permitting the relocation and awarding the parties joint legal and physical custody of the minor children. The judgment provided for equal parenting time upon both parties' relocation to Florida and parenting time for Ryan "as agreed upon by the parties" should he delay his move. The court certified the partial judgment as final under Idaho Rule of Family Law Procedure 802(b). Ryan then sought and obtained the magistrate court's permission to pursue a direct appeal to this Court pursuant to Idaho Appellate Rule 12.1(b).

## II.     STANDARDS OF REVIEW

Child custody determinations, including relocation decisions, are committed to the sound discretion of the trial court. *See Bartosz v. Jones*, 146 Idaho 449, 453, 197 P.3d 310, 314 (2008). Absent an abuse of discretion, the trial court's child custody determination will not be overturned. *Firmage v. Snow*, 158 Idaho 343, 347, 347 P.3d 191, 195 (2015). When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the boundaries of that discretion; (3) acted consistently with any legal standards applicable to the specific choices before it; and (4) reached its decision by an exercise of reason. *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

"When the trial court's decisions affect children, the best interests of the child [are] the primary consideration." *Raber v. Raber*, 175 Idaho 365, ___, 565 P.3d 808, 811 (2025) (quoting *Suter v. Biggers*, 157 Idaho 542, 546, 337 P.3d 1271, 1275 (2014)). Consequently, in matters of child custody, an "[a]buse of the trial court's discretion occurs only when the evidence is insufficient to support the conclusion that the interests and welfare of the minor children would be best served by a particular custody award or modification." *Biggers v. Biggers*, 103 Idaho 550, 555, 650 P.2d 692, 697 (1982).

## III.     ANALYSIS

**A. The magistrate court did not abuse its discretion in permitting Jennifer to relocate to Florida with the parties' minor children.**

The legal standards governing child custody and relocation determinations are well settled. "[W]hen making decisions regarding the children's custody, including decisions relating to where the children will reside," the best interests of the children "are of paramount importance." *Raber v. Raber*, 175 Idaho 365, ___, 565 P.3d 808, 812 (2025) (quoting *Danti v. Danti*, 146 Idaho 929, 934, 204 P.3d 1140, 1145 (2009)); *see also* I.C. § 32-717(1) ("In an action for divorce the court may, before and after judgment, give such direction for the custody, care and education of the children of the marriage as may seem necessary or proper in the best interests of the children."). Idaho Code section 32-717(1) directs that, in making these determinations,

> [t]he court shall consider *all* relevant factors which may include:
>
> (a) The wishes of the child's parent or parents as to his or her custody;
>
> (b) The wishes of the child as to his or her custodian;
>
> (c) The interaction and interrelationship of the child with his or her parent or parents, and his or her siblings;
>
> (d) The child's adjustment to his or her home, school, and community;
>
> (e) The character and circumstances of all individuals involved;
>
> (f) The need to promote continuity and stability in the life of the child; and
>
> (g) Domestic violence as defined in section 39-6303, Idaho Code, whether or not in the presence of the child.

I.C. § 32-717(1) (emphasis added). This list of factors is by no means exhaustive, and the trial court is "free to consider other factors that may be relevant." *Bartosz v. Jones*, 146 Idaho 449, 454, 197 P.3d 310, 315 (2008) (citing *Nelson v. Nelson*, 144 Idaho 710, 715, 170 P.3d 375, 380 (2007)); *accord Raber*, 175 Idaho at ___, 565 P.3d at 812 (citing *Searle v. Searle*, 162 Idaho 839, 844, 405 P.3d 1180, 1185 (2017)). For example, in relocation cases such as this one, other factors the court may consider include:

> The parents' motives for relocating or opposing relocation; the quality of relationship between both parents and the child; the child's attachment to both parents; the negative impact of the child's exposure to continued hostility between the parents; the extent the move would enhance the economic, emotional, and educational well-being of the custodial parent and the child; the quality of the child's lifestyle if the relocation was allowed or denied; the effect of the move on the child's relationship with extended family members; and the likelihood that suitable visitation arrangements could preserve the child's relationship with the non-custodial parent.

11

*Raber*, 175 Idaho at ___, 565 P.3d at 812 (quoting *Danti*, 146 Idaho at 939, 204 P.3d at 1150).

In addition to the above considerations, courts deciding whether to permit one parent to relocate with the children must "take into account Idaho's presumption that it is in the child's best interest to maintain frequent and continuing contact with both parents, unless one parent is [a] habitual perpetrator of domestic violence." *Bartosz*, 146 Idaho at 454, 197 P.3d at 315 (citations omitted); *see also Roberts v. Roberts*, 138 Idaho 401, 405, 64 P.3d 327, 331 (2003) ("Idaho favors the active participation of both parents in raising children after divorce, which policy is reflected in [section] 32-717B supporting joint custody."); I.C. § 32-717B(4), (5) (unless one parent is found to be a habitual perpetrator of domestic violence, "there shall be a presumption that joint custody is in the best interests of a minor child or children"). This "does not necessarily mean the child's time with each parent should be exactly the same" or that "the child should be alternating back and forth over certain periods of time between each parent." I.C. § 32-717B(2). Nor is the presumption in favor of joint custody—i.e., frequent and continuing contact with both parents— "equivalent to a presumption against a custodial parent relocating with a child." *Bartosz*, 146 Idaho at 456, 197 P.3d at 317. Again, the governing standard in child custody and relocation decisions is always the best interests of the children. *Id.* (first citing *Roberts*, 138 Idaho at 403–04, 64 P.3d at 329–30; and then citing *Ford v. Ford*, 108 Idaho 443, 445, 700 P.2d 65, 67 (1985)). Thus, "[o]nce the parent seeking permission to relocate proves that relocation is in the child's best interests, he or she will be allowed to move with the child." *Id.* at 456–57, 197 P.3d at 317–18 (citing *Roberts*, 138 Idaho at 405, 64 P.3d at 331).

Following a three-day trial on the custody and relocation matters at issue in this case, the magistrate court found that Jennifer met her burden of proving that relocation to Winter Park, Florida, was in the best interests of the parties' minor children. In reaching its decision, the court made detailed factual findings, cited the applicable legal standards, and considered and weighed what it deemed to be relevant factors, including the best interests factors set forth in Idaho Code section 32-717. Although the magistrate court agreed with the Parenting Time Evaluator that the decision before it was a "close case," it ultimately determined in an exercise of its discretion that the weight of the evidence supported relocation.

On appeal, Ryan argues that the magistrate court abused its discretion in numerous ways, including by resting its relocation decision on an erroneous factual finding that Ryan would move to Florida if Jennifer's relocation request were granted. He also argues that the magistrate court

12

improperly relied on that erroneous finding to construct a custody schedule that leaves him with little or no enforceable custody time if he remains in Idaho. Finally, he argues that the magistrate court failed to reach its decision through an exercise of reason, particularly in its analysis of the Idaho Code section 32-717 factors. Specifically, he contends that the magistrate court's factual findings are not supported by substantial evidence and that the court erroneously employed a "scoreboard" approach in weighing the statutory factors. For the reasons set forth below, we conclude that Ryan has failed to show that the magistrate court abused its discretion.

1. *Ryan has failed to show clear error in the magistrate court's finding that he would move to Florida if Jennifer's request to relocate with the children was granted.*

During his case-in-chief, Ryan testified that he was opposed to Jennifer's request to relocate RMB and KFB to Florida. He asserted that the move would be disruptive not only to his children's lives, but to his own life as well. When asked on direct examination whether he had decided to move to Florida if the relocation request was granted, he testified:

> If the court were to say our children'[s] lives will be better in Florida, then [sic] they are in Idaho, it's a decision that would be incomprehensible to me, but one of which the only control over that I have is -- is what I testify here today.
>
> If that were to happen, I know Dr. Davidson said something about Jennifer having stability or security in Florida. My relationship with our children is so important that I might feel compelled to sacrifice my own sense of stability and my own sense of security and move, because I don't know that the relationship our children have with me would survive a long distance relationship.
>
> . . . .
>
> If the court said that our children would be better off living in Florida than Idaho, I would not want to move, but I may feel compelled to because the relationship, I think -- I don't know that our -- the relationship our children have with me would survive otherwise.

Jennifer's counsel revisited this topic with Ryan on cross-examination, and the following exchange occurred:

> Q.     If the court were to permit Jennifer and the children to relocate to Florida, I think your testimony here today was that you would relocate down there.
>
> A.     I stated I might feel compelled to in order to protect the relationship our children want and deserve and have had with me their entire lives.
>
> Q.     So would you?
>
> A.     This is the most consequential decision, and I -- I love our children more than anything. It's -- it's painful to think about being separated from them.

13

Painful to think about what could happen if I wasn't physically and regularly in their presence.

And so I -- I think I would have to sacrifice my own sense of stability, my own sense of security, and do the only thing that's within my control to ensure that the relationship they have and deserve to have with me is preserved.

I -- I don't know that I would have any other choice but to move, if that's what the court ordered.

Q. Okay. So you would, if the court were to permit it?

A. I don't know that I can a hundred percent commit to that right now. But I don't -- in the moment, right now, I don't see, based on what I have observed in this case, how I can make any other decision.

In its written decision entered after trial, the magistrate court made a factual finding that "Ryan would relocate to Florida if the [c]ourt granted Jennifer's request to relocate." The court then incorporated this finding into its consideration and weight of the Idaho Code section 32-717(1) best interests factors. For instance, the court found that the section 32-717(1)(a) "wishes of the parents" factor was "neutral as to relocation as each party would stay, or go, depending on what the [c]ourt orders for relocation, which would allow each party [to] exercise the presumptive joint custody." Similarly, it found that other factors, such as the wishes of RMB as to her custodian, *see* I.C. § 32-717(1)(b), supported presumptive joint custody and, as such, were "neutral as to relocation." The court also relied on its finding that Ryan would relocate in crafting a custody schedule that would give Ryan and Jennifer equal parenting time once both parties moved to Winter Park.

On appeal, Ryan argues the magistrate court's finding that he "would relocate to Florida" is clearly erroneous because his testimony on this point was "conflicted" and "equivocal." Specifically, he contends that the magistrate court's finding must be set aside because, although he acknowledged during his testimony that "he would contemplate a move if Jennifer were permitted to take the children away, he clearly stated he did not want to move" and "he did not and could not commit to moving."

"When reviewing the trial court's findings of fact, the appellate court will not set aside the findings on appeal unless they are clearly erroneous such that they are not based upon substantial and competent evidence." *Nelson*, 144 Idaho at 713, 170 P.3d at 378 (first citing *Reed v. Reed*, 137 Idaho 53, 56, 44 P.3d 1108, 1111 (2002); and then citing *Hunt v. Hunt*, 137 Idaho 18, 20, 43 P.3d 777, 779 (2002)). "Evidence is substantial 'if a reasonable trier of fact would accept it and rely

upon it in determining whether a disputed point of fact has been proven.'" *Danti*, 146 Idaho at 934, 204 P.3d at 1145 (quoting *King v. King*, 137 Idaho 438, 442, 50 P.3d 453, 457 (2002)). "[W]e view the evidence in favor of the magistrate[ court]'s judgment and will uphold the magistrate[ court]'s findings even if there is conflicting evidence." *Id.* (citing *Nelson*, 144 Idaho at 713, 170 P.3d at 378). "[W]e are precluded from substituting our judgment for that of the fact finder as to the credibility of witnesses, the weight of testimony and the reasonable inferences to be drawn from the evidence." *Schneider v. Schneider*, 151 Idaho 415, 424, 258 P.3d 350, 359 (2011) (quoting *State v. Bettwieser*, 143 Idaho 582, 588, 149 P.3d 857, 863 (Ct. App. 2006)). "Instead, we defer to the trial court's unique ability to accurately weigh the evidence and judge the demeanor of the witnesses while taking into account the trial court's superior view of the entire situation." *Wilson v. Mocabee*, 167 Idaho 59, 68, 467 P.3d 423, 432 (2020) (punctuation modified), *quoted in Wilson v. Wilson*, 174 Idaho 979, 989–90, 560 P.3d 1126, 1136–37 (2024).

Applying these standards, Ryan's first contention—that he never unequivocally committed to relocating—does not show that the magistrate court's factual finding that he would relocate is clearly erroneous. It is true that Ryan repeatedly used qualifying language, stating he "might feel compelled" to move and that he could not "a hundred percent commit." But the magistrate court was not required to isolate those qualifiers from the broader context of his testimony. When viewed as a whole, Ryan's testimony consistently conveyed that (1) his relationship with his children was paramount, (2) he believed that relationship would not survive long-distance separation, and (3) his relocation to Florida would likely be the only realistic means of preserving it. He testified that he "would have to sacrifice" his stability, did not know that he would "have any other choice but to move," and did not "see . . . how [he could] make any other decision." From this, the magistrate court could reasonably infer that, although Ryan did not want to move, he would choose to do so if Jennifer's relocation request was granted.

Ryan's characterization of his testimony as "conflicted" likewise does not show error in the magistrate court's factual finding. The presence of internal tension in a witness' testimony goes to weight and credibility—matters squarely within the trial court's province. *Wilson*, 174 Idaho at 989, 560 P.3d at 1136; *Danti*, 146 Idaho at 934, 204 P.3d at 1145; *Schneider*, 151 Idaho at 424, 258 P.3d at 359. Here, the magistrate court could reasonably conclude that Ryan's repeated statements that he would feel compelled to move, coupled with his inability to identify any viable alternative, outweighed his reluctance to make an absolute commitment on the record. Indeed,

15

Ryan was given multiple opportunities to state that he *would not* or even *could not* move to Florida if the relocation request was granted, but he never did so.

Ryan next argues that the magistrate court improperly relied on the "hypothetical" finding that he would move to Florida to conclude that the parents' wishes were a neutral factor in the relocation decision and to structure a custody arrangement that effectively conditions his parenting time on relocation. To the extent this argument challenges the evidentiary basis for the finding itself, it fails for the reasons discussed above. The magistrate court's determination that both parents would align their residence with the court's relocation decision finds support in the record: Jennifer testified she would remain in Idaho if relocation was denied, while Ryan's testimony supports the inference that he would follow the children if relocation was granted. Based on that evidence, the court could reasonably conclude that neither parent's stated preference weighed for or against relocation.

In sum, although Ryan's testimony was not unequivocal, it provided a sufficient evidentiary basis for the magistrate court to find that he likely would relocate if Jennifer's relocation request was granted. The magistrate court was entitled to interpret Ryan's statements as reflecting a reluctant but probable course of action driven by his desire to preserve his relationship with his children. Because that finding is supported by substantial and competent evidence, it will not be disturbed on appeal.

2. *The magistrate court did not abuse its discretion in relying on the finding that Ryan would move to Florida to support its relocation and custody decisions.*

In addition to challenging the evidentiary support for the magistrate court's finding that he would move to Florida if Jennifer's relocation request was granted, Ryan argues that the magistrate court abused its discretion by overemphasizing that finding and relying on it as the sole basis to support its relocation and custody decisions. He also argues that the magistrate court's custody schedule—which gives him equal parenting time upon his move to Florida or parenting time "as agreed upon by parties" should he delay his move—coerces him to move, shifts the burden to the non-moving party to prove relocation is not in the children's best interests, and "violates the presumption favoring the active participation of both parents under Idaho Code [section] 32-717B[.]" Ryan's arguments are unavailing.

First, the record does not support Ryan's claim that the magistrate court overemphasized its finding regarding Ryan's relocation when conducting its best interests analysis. Idaho law is clear that a court making a child custody determination may abuse its discretion by

16

overemphasizing any single best interests factor. *Hess v. Hess*, 174 Idaho 524, 538, 558 P.3d 254, 268 (2024); *Peterson v. Peterson*, 153 Idaho 318, 324, 281 P.3d 1096, 1102 (2012); *Bartosz v. Jones*, 146 Idaho 449, 458, 197 P.3d 310, 319 (2008). The law is equally clear, however, that overemphasis occurs only where the court fails to consider all relevant best interests factors or treats a single factor as determinative of the custody decision. *See, e.g.*, *Hess*, 174 Idaho at 538–39, 558 P.3d at 268–69 (rejecting argument that trial court overemphasized father's statements regarding willingness to be bound by court orders where record showed the court expressly considered all factors and merely assigned more weight to father's statements); *Moye v. Moye*, 102 Idaho 170, 172, 627 P.2d 799, 801 (1981) (finding an abuse of discretion where the court based its custody determination on its consideration of mother's physical condition to the exclusion of "all other relevant factors impacting on the best interests of the children"). Although Ryan argues otherwise, even a cursory review of the magistrate court's decision reveals that is not what occurred in this case.

The magistrate court did not rely on its finding that Ryan would move to Florida as the sole basis for its decision that relocation to Florida was in the children's best interests. Rather, as reflected in the magistrate court's findings of fact and conclusions of law, it conducted a comprehensive analysis of all of the section 32-717 best interests factors and also considered additional factors specific to relocation cases, including Jennifer's motives for wanting to relocate with the children, whether there were "emotional, educational, or financial benefits to relocating," and the children's ties to and relationship with extended family. The magistrate court did rely on its finding that Ryan would move as a basis to conclude that "each party would stay, or go, depending on what the [c]ourt orders for relocation, which would allow each party [to] exercise the presumptive joint custody." However, the fact that the magistrate court gave weight to Ryan's stated intention to move in considering whether relocation was in the children's best interests does not show an abuse of discretion. To the contrary, it shows that the magistrate court recognized Idaho's presumption in favor of joint custody and appropriately accounted for Ryan's intent to move in assessing whether that presumption could be maintained if the relocation request was granted.

Ryan does not seriously contend that the magistrate court failed to consider the section 32-717 factors. Instead, his overemphasis argument rests on his assertion that the magistrate court's relocation and custody decisions were "premised on the finding that [he] would, without question,

17

move to Florida if Jennifer were permitted to relocate with the minor children." According to Ryan, "[w]ithout the *assumption* of Ryan moving to Florida, the underlying conclusion that the move is in the children's best interests cannot stand." (Emphasis added.) This argument fails, as it is merely a repackaging of Ryan's challenge to the magistrate court's factual finding. As explained above, the magistrate court reasonably inferred from Ryan's testimony that he would move to Florida if Jennifer's relocation request was granted. Because that finding is supported by substantial evidence, it was a proper consideration in the court's best interests analysis. A court does not abuse its discretion by giving weight to a fact that is supported by substantial and competent evidence in the record. *Hoskinson v. Hoskinson*, 139 Idaho 448, 456, 80 P.3d 1049, 1057 (2003).

In a related argument, Ryan contends that "the magistrate court acted beyond the outer boundaries of its discretion in a manner inconsistent with the specific choices available to it in ordering a custody schedule based solely on a *hypothetical* relocation by Ryan." (Emphasis added.) According to Ryan, the custody schedule—which gives him equal parenting time with Jennifer upon his move to Florida or custody time "as agreed upon by the parties" should he delay his move—is "punitive" and *forces* him to either move to Florida or risk having "no enforceable time or schedule of care" with his children. Similarly, he contends that by "[c]oercing or forcing" him to move to support its relocation and custody decision, the magistrate court improperly relieved Jennifer of her burden of proving relocation was in the children's best interests and shifted the burden to him to prove the opposite. Again, we are unpersuaded.

Like his overemphasis argument, Ryan's "coercion" arguments rest on the faulty premise that the magistrate court clearly erred in its finding that Ryan would move to Florida if Jennifer's relocation request was granted. The magistrate court did not order Ryan to move, nor could it. *See Kelly v. Kelly*, 165 Idaho 716, 732, 451 P.3d 429, 445 (2019) ("In a divorce action where custody is at issue, a court lacks the authority to order where the parents must live." (citing *Allbright v. Allbright*, 147 Idaho 752, 754, 215 P.3d 472, 474 (2009))). Nor did it ever shift the burden to Ryan to prove that relocation was not in the children's best interests. To the contrary, the court correctly recognized that it was Jennifer's burden to prove relocation was in the children's best interests, it considered the relevant evidence and statutory factors, and it ultimately found that Jennifer met her burden. It then structured a custody arrangement based on its supported factual finding that Ryan would in fact move to Florida if Jennifer was permitted to relocate with the children there.

18

If it is *now* Ryan's position that he will not move to Florida, that is a change in circumstance that may be raised to the magistrate court in support of a request for modification of the custody order.

Finally, we reject Ryan's argument that the magistrate court's relocation and custody decision "violates the presumption favoring the active participation of both parents under Idaho Code [section] 32-717B[.]" First, to the extent Ryan argues that section 32-717B creates a presumption against relocation of a minor child, he is incorrect. As we have recently reiterated, "while Idaho Code section 32-717B provides a presumption in favor of 'frequent and continuing contact with both parents,'" it does not create a presumption against relocation, and "it is within the trial court's discretion to determine precisely how much time each parent has with the child, or in other words, to define the frequency of contact[.]" *Wilson*, 174 Idaho at 987, 560 P.3d at 1134 (citing *Bartosz*, 146 Idaho at 456–57, 197 P.3d at 317–18). Second, we do not agree that the relocation and custody order entered by the magistrate court in this case runs afoul of the section 32-717B presumption. To the contrary, the magistrate court's order gives effect to the preference for frequent and continuing contact by awarding Ryan and Jennifer equal parenting time when Ryan moves to Florida. Like his other arguments, Ryan's argument that the magistrate court's order deprives him of frequent and continuing contact with his children is based solely on his erroneous assertion that the evidence does not support the court's finding that he would move to Florida if the relocation request were granted.

3.   *Substantial and competent evidence supports the magistrate court's conclusion that relocation to Florida is in the children's best interests.*

The magistrate court issued its relocation and custody decision following a three-day bench trial at which the parties testified and presented witnesses and evidence in support of their respective positions. The magistrate court's decision contains detailed findings of fact and conclusions of law, reflecting a careful and methodical application of the governing legal standards. The court expressly identified and applied the best interests factors set forth in Idaho Code section 32-717, as well as additional factors relevant to the relocation issue in this case. The court recognized Idaho's presumption for joint custody and also recognized that, as the party seeking to move, Jennifer bore the burden of proving that relocation is in the children's best interests. Finally, the court correctly cited our decision in *Weiland v. Ruppel*, 139 Idaho 122, 125, 75 P.3d 176, 179 (2003), for the propositions that "relocation cases are fact-driven cases," and "[s]o long as the court's decision is supported by substantial evidence and results from the proper

19

consideration of the facts pursuant to all relevant factors including those set forth in the statute, the trial court's discretion has been properly exercised."

With all of these principles in mind, the magistrate court considered the parties' competing positions, evaluated the evidence presented at trial, resolved conflicts in that evidence, and made specific findings as to each relevant factor. The magistrate court considered ten factors in total: (1) the parents' wishes, (2) the children's wishes, (3) the interaction and interrelationship of the children and their parents and sibling, (4) the children's adjustment to their home, school, and community, (5) the character of each party, (6) the need to promote continuity and stability in the children's lives, (7) whether there was domestic violence, (8) Jennifer's motives for wanting to relocate with the children, (9) the emotional, educational, or financial benefits of relocating, and (10) the children's relationships with their extended family. Of these factors, the magistrate court found that only one factor—adjustment to home, school, and community—weighed "slightly" in favor of the children staying in Idaho, while the remaining factors were either neutral or favored the children's relocation to Florida. Although the court agreed with the Parenting Time Evaluator that this was a "close case," it ultimately concluded that "Jennifer has met her burden and has established it is in the best interest for the children to relocate to Winter Park, Florida."

On appeal, Ryan does not argue that the magistrate court reached its relocation decision without considering factors bearing on whether the proposed relocation was in the best interests of the children. Rather, he argues that the magistrate court failed to exercise reason when it decided to "uproot the children" because, he contends, the court's findings as to certain factors are not supported by substantial and competent evidence and do not support the court's ultimate conclusion that Jennifer met her burden of proving the move was in the children's best interests. We will address each of Ryan's arguments in turn.

a.  Community and family support

In its findings of fact and conclusions of law, the magistrate court determined that the children's ties to community and extended family in Florida weighed in favor of relocation. The court found that the children's connections in Idaho, while present, "do not run deep," and that both the children and Jennifer would benefit from a stronger support system in Winter Park, which the court found was "clearly a home base for Jennifer's side of the family . . . ." Although the court acknowledged Ryan's testimony that he and the children have an "extensive community" in Idaho, it ultimately found that the evidence demonstrated otherwise and that there was "not much keeping

20

either party here." It also found that any concerns Ryan had about continued hostility from Jennifer's family, including her father, were unfounded.

Ryan takes issue with each of the above findings, arguing they are not supported by substantial and competent evidence. First, he appears to challenge the magistrate court's assessment of the extent to which the children have family support in Winter Park, asserting that while Jennifer's 95-year-old grandmother lives there, the trial evidence shows her mother and father divide their time between Winter Park and a home in Pennsylvania, and her siblings reside elsewhere and only visit periodically. Ryan's argument is unavailing. Both Jennifer and her mother testified that Jennifer and the children have an extensive network of family and friends in the Winter Park area. Additionally, although Jennifer's mother spends some time in Pennsylvania to take care of her ailing father, she testified that Winter Park is her "home base," and it is also the "home base" for their entire family. This testimony constitutes substantial and competent evidence supporting the magistrate court's finding that Jennifer and the children have a community of family and friends in Florida.

Next, Ryan challenges the magistrate court's finding that "there is not much keeping either party" in Idaho. He argues that, in reaching this conclusion, the court disregarded the testimony and evidence showing that he is actively involved in his church and RMB's school and, through those activities, has "connections with the school and church communities in Boise." He also argues that the court's finding ignores his testimony that he has "established very deep relationships" in Idaho and that, in his opinion, "[t]here is nothing waiting for" him or his children in Florida. The record does not support these assertions. The magistrate court expressly acknowledged Ryan's involvement in church activities and RMB's school but found that his relationships in Idaho were largely limited to those settings and were more in the nature of acquaintances. The magistrate court's findings in this regard are supported by the trial evidence. Ryan himself testified that his "community in Idaho is mainly based with church as well as building relationships with people and [RMB]'s school." And the witnesses he called on his behalf to testify about his community in Idaho all testified that, aside from interacting with Ryan at church or school events, they had little to no social interaction with him. To the extent Ryan maintains that the magistrate court undervalued his community connections in Idaho, that argument simply asks us to reweigh the evidence, which we will not do.

21

Ryan also takes issue with the weight the magistrate court placed "on allowing the move to 'enhance the relationship of the children and their extended family in Florida.'" Ryan interprets this finding as a determination that enhancing the children's relationship with their extended family is more important than maintaining their relationship with him, but that is a mischaracterization of the magistrate court's decision. The court did not find that extended family relationships were more important than the children's relationship with their father. Rather, the court found—based on its supported finding that Ryan would relocate to Florida if the relocation request were granted—that the children would be able to maintain frequent and continuing contact with both parents while also benefitting from increased contact with extended family. In other words, the court concluded the move would provide the best of both worlds, not that one relationship would supplant the other.

Finally, Ryan takes issue with the magistrate court's rejection of his concerns about ongoing hostility from Jennifer's father. The trial evidence showed that, after Jennifer took the children to Florida following KFB's baptism, she disclosed to her father that Ryan had engaged in inappropriate sexual behavior with RMB and had admitted to viewing child pornography years earlier. As found by the magistrate court, these disclosures, along with subsequent abuse allegations, colored Jennifer's father's perceptions such that "[w]hen the [divorce] proceedings originally began, including up to when [the] PTE [was] filed, Jennifer's father had a very negative view of Ryan." The court found, however, that "[t]his negative attitude has lessened over time," and "[d]espite the initial negative attitude, Jennifer's father did not speak poorly of Ryan in front of the children." It also found that, "[m]ore recently, Jennifer's father is willing to help Ryan if he chose to relocate to Florida and even be an advocate for him."

On appeal, Ryan argues that there is no competent evidence supporting the magistrate court's findings that Jennifer's father had "tempered" his view of Ryan and that he would be "willing to help Ryan" if he moved to Florida. Ryan acknowledges that Jennifer and her mother both testified at trial that Jennifer's father would support or be an "advocate" for him, but he argues that no rational trier of fact would accept this "self-serving" testimony, especially in light of the fact that Jennifer's father did not testify and never personally recanted the statements he made in a prior declaration and to the Parenting Time Evaluator about Ryan's character, including his belief that Ryan sexually abused RMB. He also argues that Jennifer's testimony on this point is "particularly outrageous in light of other facts in the record," including evidence that Jennifer never

recanted her allegations of sexual abuse or informed individuals in whom she had confided that the allegations were investigated and found unsubstantiated.

Ryan's arguments are unpersuasive. It is the role of the trial court—not this Court—to assess witness credibility and weigh competing testimony. *Schneider v. Schneider*, 151 Idaho 415, 424, 258 P.3d 350, 359 (2011). When asked on direct examination to explain her thoughts regarding Ryan's concerns about her family and, in particular, her father, Jennifer testified:

> I think that that demeanor, if you will is one that has shifted significantly as time has passed. You know, this has been now a year and a half that we have been in this situation and, yes, my dad was very angry at the beginning of this and said some things that I really wish he didn't.
>
> However, I never witnessed him say anything negative about Ryan in front of our children. And so not only has that continued, but also our conversations have evolved tremendously. His -- our conversations are about what can he do to help us have a great life, you know, how he can help Ryan.

Then, when asked whether she believed there would be any "significant issues" with her family if Ryan moved to Florida, Jennifer testified: "If Ryan wanted it, I think my dad would be an advocate for him."

Jennifer's mother similarly testified that Jennifer's family would be supportive of Ryan if he were to move to Florida, explaining:

> We actually believe that it's in the best interest of the children and everyone to be in -- in Winter Park, Florida. And we would do everything we can to help facilitate that, whether it's, like, here's some really good realtors, here's, you know, some good doctors. Whatever would be necessary.

Regardless of whether Ryan personally believes that Jennifer and her mother were sincere, the magistrate court was entitled to credit their testimony regarding the current state of Jennifer's father's views, even in the absence of his direct testimony or an express recantation of his earlier statements. Ryan's challenge largely asks this Court to second-guess those credibility determinations and to discount testimony the magistrate court found persuasive.

To the extent Ryan argues that no rational trier of fact could have credited this testimony, we disagree. The record reflects that a significant amount of time had passed since Jennifer's father made the statements on which Ryan relies, that the abuse allegations had been investigated and found unsubstantiated, and that Jennfier and her extended family were attempting to move forward for the benefit of everyone involved. The magistrate court could reasonably infer from this evidence that Jennifer's father's views had evolved and that he would be willing to support Ryan

23

if he relocated. While Ryan points to contrary inferences, the magistrate court was not required to adopt them. Substantial and competent evidence supports the court's finding, and we will not disturb it on appeal.

### b. Character

As part of its analysis, the magistrate court considered each party's character as it bore on whether relocation was in the children's best interests. *See* I.C. § 32-717(1)(e) (providing that "[t]he character and circumstances of all individuals involved" is a factor the court may consider when making a custody determination). Although the magistrate court found that "both parties are generally of good character," it did express concerns about specific conduct. As to Jennifer, the court explained:

> One concern regarding her character is her choice to leave for Florida with the children in 2024. This was compounded by her continued allegations of abuse. She also shared her concerns with others that impacted their view of Ryan. Including her father. This concern is somewhat tempered by why she had her concerns, but to the extent that repeated professional investigations ruled out abuse she continued to make allegations. This limited Ryan's time with the children at the outset of the proceeding. On the other hand, she has since accepted investigations and has made the choice to move past her concerns she has had and is now supportive of equal custody time. Her position as to equal custody is to her credit . . . . The [c]ourt also concludes that her raising the concerns was not unfounded. Ryan's testimony regarding whether he viewed child pornography support[s] Jennifer's doubts about Ryan. This is also the case to what she observed regarding Ryan having an erection around [RMB]. Though the [c]ourt does not find, or conclude, that Ryan did anything wrong. The way he explains situations left a valid impression with Jennifer that she should have concerns. Another example of this is Ryan raising the former co-worker who shot his wife and killed himself. Ryan brought this up in an argument but fails to see how brin[g]ing this up would be threatening to Jennifer.

The court also expressed concerns about some of Ryan's behavior, explaining:

> Ryan was aggressive during arguments with Jennifer, often yelling. He also has not responded well to these proceedings. Though the [c]ourt can certainly understand Ryan's frustrations, his continued emphasis on Jennifer's behavior and his inability to move past it gives the [c]ourt some concern regarding his ability to co-parent with her long-term. This is evidenced[d] by the [c]ourt ordering him to only take personal items from the community home. Instead of taking what he needed, he took what he felt he should have and left what he thought was sufficient for Jennifer. He also continued to run along the greenbelt next to the parties' residence despite the stay away order, requiring an additional order directing him specifically to stay away from that area.

Ultimately, the magistrate court found that the parties' character was "a neutral factor as to relocation."

On appeal, Ryan appears to challenge the above findings on three bases. First, he takes issue with the magistrate court's determination that Jennifer's "raising the concerns" about potential sexual abuse and viewing of child pornography "was not unfounded." Ryan argues that because "Jennifer only made [the sexual abuse] allegations in conjunction with her divorce filing," and because her allegations that Ryan had viewed child pornography rested on a conversation that she had with Ryan before they were married, the magistrate court's finding that her concerns were "not unfounded" cannot stand. However, aside from this conclusory argument, Ryan does not explain why this is so, nor does he address the evidence on which the magistrate court relied to support its finding. Jennifer testified at trial that, on three separate occasions, she witnessed Ryan with an erection while he was holding RMB. She also testified that Ryan told her before they got married that he had viewed child pornography. Although Ryan disputed having ever knowingly viewed child pornography, he admitted to having told Jennifer that he viewed pornographic images and videos of girls who may have been under eighteen. Based on this evidence, the magistrate court could reasonably conclude that Jennifer had valid bases to raise her concerns, even if her allegations were later determined by authorities to be unsubstantiated.

Next, Ryan criticizes the magistrate court's decision to "credit[] Jennifer for having 'made the choice to move past her concerns,'" asserting that, other than Jennifer's "lip-service," there was "not a shred of evidence that such was actually the case." This argument fails for two related reasons.

First, it again rests on a challenge to the magistrate court's credibility determinations. Whether Jennifer had genuinely "moved past" her concerns was a factual question informed by her testimony and demeanor at trial. Ryan's characterization of that testimony as mere "lip-service" simply asks this Court to reweigh the evidence and substitute its judgment for that of the trial court.

Second, the record contains evidence supporting the magistrate court's finding. Jennifer testified that her perspective had evolved over time; that although she had "observed what [she] observed," she accepted that the abuse allegations had been investigated and found unsubstantiated; and that she was focused on moving forward in a manner that served the children's best interests. The magistrate court could reasonably infer from this testimony that Jennifer had, in fact, chosen to move past her prior concerns. That Ryan disagrees with that inference does not render it unsupported.

Finally, Ryan challenges the magistrate court's finding that his conduct—specifically his continued focus on Jennifer's behavior and inability to move past it—raised concerns about his ability to co-parent. He argues that this finding improperly faults him for responding to Jennifer's behavior in "absconding with the children to Florida and filing numerous unfounded allegations of child abuse . . . ." According to Ryan, "[t]he magistrate court's determination that Ryan's response to *Jennifer's* actions was a concern about *Ryan's* character" runs afoul of the holding in *Hopper v. Hopper*, 144 Idaho 624, 627, 167 P.3d 761, 764 (2007), that an absconding parent should not be permitted to benefit from his or her own conduct. We disagree.

Contrary to Ryan's assertions, the court did not fault him for responding to Jennifer's conduct or permit her to benefit from any alleged wrongdoing. Rather, it considered how Ryan's ongoing focus on past allegations—and his inability to move beyond them—affected his present ability to effectively co-parent. That is a proper consideration under the best interests analysis.

For similar reasons, Ryan's reliance on *Hopper* is misplaced. In *Hopper*, the mother absconded out of state with the parties' child and was permitted to remain there throughout the duration of the custody proceedings, which limited the father's contact with the child. 144 Idaho at 762, 167 P.3d at 625. By the time of trial, the mother had developed a stronger relationship with the child, and the magistrate court relied on that disparity in granting her request to relocate. *Id.* at 764, 167 P.3d at 627. This Court reversed, explaining that a court cannot rely on a parent's enhanced relationship with a child when that relationship exists only because of the parent's own misconduct. *Id.*

The concern addressed in *Hopper* is not present here. The magistrate court did not "reward" Jennifer for leaving the state with the parties' children or for making allegations of abuse that were ultimately deemed unsubstantiated. To the contrary, it found that both parents have strong relationships with their children. The magistrate court's concern regarding Ryan's ongoing focus on Jennifer's past conduct related solely to Ryan's ability to effectively co-parent. Ryan's argument to the contrary—that the magistrate court "cast blame on *Ryan* for Jennifer's wrongful conduct"—is without merit.

c.   Finances

The evidence at trial established that Ryan and Jennifer have a combined net worth of approximately $10 million, which includes approximately $6 million in liquid assets. In light of this evidence, the magistrate court found that "[e]ven after the divorce, neither party will need to

work to provide a high quality of life for the children." Later in its decision, the court considered as a factor in its best interests analysis whether there were any "emotional, educational, or financial benefits to relocating" and made the following findings:

> The [c]ourt agrees that education for the children is essentially a neutral factor as both locations have suitable educational options. On the other hand, the [c]ourt concludes that Florida does provide a more viable further economic potential for both parties. This is in part based on the connections Jennifer and her father have in the area. It is also based on Jennifer's ability to more likely secure part time employment in the future. This case presents and [sic] interesting circumstance that neither party is tied to the current residence for employment. Though work at Intuit brought the parties to Idaho, that position has been eliminated. Further, neither party has obtained employment since. There is realistically no financial, and limited social, reason for the parties to remain in Idaho. There is also a greater support system available in Florida with Jennifer's extended family. Given her prior mental health concerns, relocation would provide her a more stable support system that does not exist in Idaho. This factor weights in favor of relocation.

As to the financial benefits of relocation, the magistrate court subsequently reiterated its finding that there are "better employment opportunities in the Orlando area that provide each party better opportunities for when (or if) they go back to the workforce."

On appeal, Ryan argues that the magistrate court's findings regarding the parties' finances and future employment opportunities are internally inconsistent and unsupported by the evidence. He contends that, after finding that neither party needed to work to provide a high quality of life for the children, the court failed to exercise reason when it relied on future employment opportunities in Florida as a factor favoring relocation. He further asserts that this conclusion conflicts with the vocational evaluation admitted at trial, which indicated that Jennifer "would likely be more competitive in the Boise labor market . . . ." Again, we are not persuaded that the magistrate court erred.

Contrary to Ryan's assertions, the magistrate court's findings are not internally inconsistent. The magistrate court reasonably recognized that, although neither party is required to work to meet the children's needs, future employment prospects remain a relevant consideration in the best interests analysis. This is particularly true in light of the evidence that Jennifer, who was just thirty-seven years old at the time of trial, intends to return to the workforce when the parties' youngest child begins preschool. Nor does the vocational evaluation render the court's findings unsupported. At most, it presented competing evidence regarding the relative job markets. The magistrate court was entitled to weigh that evidence and draw reasonable inferences, including

that Florida offers greater economic potential based on Jennifer's established connections in the area, the availability of part-time employment, and the broader support system provided by her extended family.

### d. Motivations

At Ryan's request, and because this is a relocation case, the magistrate court expressly considered Jennifer's motives for wanting to relocate as a factor in its best interests analysis. *See, e.g.*, *Raber v. Raber*, 175 Idaho 365, ___, 565 P.3d 808, 812 (2025) (recognizing "parents' motives for relocating or opposing relocation" as a relevant factor in relocation cases (quoting *Danti*, 146 Idaho at 939, 204 P.3d at 1150)). Although Ryan asserted that Jennifer's wish to relocate was based on a desire to distance the children from him and to limit his parenting time, the magistrate court rejected that assertion and found instead that "Jennifer's relocation motive is based on what she believes is in the [children's] best interest." The magistrate court further found that Jennifer was supportive of 50/50 custody (regardless of location), and that she desired to be closer to family and friends and have part-time employment. Ultimately, the magistrate court concluded that Jennifer's motives weighed in favor of relocation.

Ryan does not argue that the magistrate court's findings regarding Jennifer's motives are not supported by Jennifer's testimony. Instead, he contends that the court erred by crediting Jennifer's motives without also expressly considering his reasons for opposing relocation—namely, his interest in preserving the children's community, continuity, and stability in Idaho. According to Ryan, "[b]y accepting Jennifer's subjective belief as a positive factor while ignoring Ryan's objective testimony regarding stability, the magistrate court applied an asymmetrical standard that favored relocation over the status quo . . . ."

The record does not support Ryan's claim. Although the magistrate court did not address Ryan's motives in the same portion of its decision where it discussed Jennifer's motives, it clearly considered them as part of its overall analysis. The court expressly recognized Ryan's involvement in his church and RMB's school, as well as the children's activities and connections in Idaho. That the magistrate court did not assign these considerations dispositive weight does not constitute an abuse of discretion.

### e. Continuity and stability of children

Ryan argues that the magistrate court failed to properly analyze the children's continuity and stability. He contends the magistrate court's analysis rested on a speculative assumption that

he would relocate to Florida and therefore ignored the disruption caused by moving the children away from him and from a community where they were thriving. He further asserts that the court failed to meaningfully compare the children's current circumstances in Idaho with what their lives would look like in Florida *without him* and instead relied on generalized benefits, such as proximity to Jennifer's extended family.

This argument fails because it rests on a premise we have already rejected. As explained above, the magistrate court's finding that Ryan would relocate to Florida if Jennifer's relocation request were granted is supported by substantial and competent evidence. In light of that finding, the magistrate court was not required to analyze continuity and stability as though Ryan would remain in Idaho and the children would be separated from him. Rather, it reasonably evaluated continuity and stability with the understanding that the children would continue to have a close and active relationship with both parents.

Viewed in that light, the magistrate court's analysis is supported by the record. While the magistrate court acknowledged that the children were doing well in Idaho, it also considered the benefits of relocation, including the presence of extended family and a stronger support system in Florida. The magistrate court was entitled to weigh these competing considerations and conclude that relocation would enhance, not undermine, the children's long-term stability. Ryan's argument to the contrary again asks this Court to reweigh the evidence and adopt a different view of the facts, which is not this Court's province.

4. *The magistrate court did not improperly utilize a "scoreboard approach" in its best interests analysis.*

The magistrate court reached its relocation decision after considering and weighing ten factors it deemed relevant to its analysis, including all the best interests of the child factors identified in Idaho Code section 32-717. Of the ten factors it considered, the magistrate court found that four factors favored relocation, one factor "slightly" favored Idaho, and the other factors were "neutral." As to the neutral factors, the court explained that many of them did not weigh for or against relocation because they implicated the presumption for joint custody—a presumption the magistrate court found would not be disrupted either way given its finding that "each party would stay, or go, depending on what the [c]ourt orders for relocation." In the end, the magistrate court concluded that Jennifer had met her burden of establishing that relocation to Winter Park was in the children's best interests because the evidence, viewed as a whole, supported that result.

29

On appeal, Ryan argues that the magistrate court improperly applied a "scoreboard approach" to its best interests analysis. Specifically, he contends that, instead of weighing all of the best interests factors, including those that it deemed neutral, the court simply tallied up the four factors it found favored relocation against the one factor favoring Idaho to "declare a best-interest 'winner.'" Ryan argues that this was error because, by their nature, "neutral" factors weigh in favor of the status quo—in this case, staying in Idaho. Ryan submits that, when the neutral factors are added to the best interests calculous, the weight of all the factors "is on the side of denying the relocation." He contends that by using its "'scoreboard' approach" to reach the opposite conclusion, the magistrate court failed to exercise reason and acted inconsistently with the governing legal standards that place the burden on the moving party to prove relocation is in the children's best interests and require the court to presume that an award of joint physical custody is in the children's best interests.

Ryan's arguments fail for several reasons. First, the record does not support Ryan's claim that the magistrate court employed a "scoreboard approach" in its best interests analysis. Although the court identified whether particular factors favored one outcome or were neutral, nothing in its decision indicates that it resolved the case by simply counting factors. Idaho law requires courts making child custody determinations, including determinations as to where the child should reside, to consider all relevant factors, apply those factors to the evidence, and weigh the factors to reach a decision. *Bartosz v. Jones*, 146 Idaho 449, 458–59, 197 P.3d 310, 319–20 (2008); *Lamont v. Lamont*, 158 Idaho 353, 361–62, 347 P.3d 645, 653–54 (2015). The magistrate court's written decision reflects precisely that type of qualitative analysis. It explained its reasoning as to each factor and identified why certain considerations—such as the availability of extended family support and long-term stability and continuity—carried greater significance in the circumstances presented. Ryan's assertion that the court must expressly explain why one factor outweighs another imposes a requirement not found in Idaho law.

Second, the magistrate court did not disregard the neutral factors. Ryan's argument rests on the premise that a factor deemed "neutral" must be treated as weighing against relocation because it does not affirmatively support it. That premise is incorrect. A neutral factor, by definition, does not favor either outcome. *See Schneider v. Schneider*, 151 Idaho 415, 425, 258 P.3d 350, 360 (2011) ("Where every other factor in [section] 32-717(1) is neutral, there is nothing improper in basing the custody decision on only one factor if that factor is found to weigh in favor

of one parent over the other."). The magistrate court did not ignore those factors; rather, it expressly addressed them and explained why several did not weigh for or against relocation. In particular, the court found that factors implicating the presumption favoring joint custody—such as the children's relationships with both parents and their ongoing contact—were neutral because, in light of its supported finding that Ryan would relocate, those relationships would not be disrupted. Thus, the magistrate court's treatment of the neutral factors reflects reasoned consideration, not disregard, of how those factors operated under the facts as found.

Third, Ryan's argument that the court's analysis ran afoul of our decision in *Roberts v. Roberts*, 138 Idaho 401, 64 P.3d 327 (2003), is misplaced. That decision, like many others, requires the relocating parent to prove relocation is in the children's best interests, but it does not mandate any particular method of weighing the evidence or require that every factor affirmatively support relocation. *Roberts*, 138 Idaho at 405, 64 P.3d at 331. Nor does it require that neutral factors be aggregated and counted against the moving party. The magistrate court expressly recognized that it was Jennifer's burden to prove relocation was in the children's best interests and it ultimately concluded, after weighing all relevant considerations, that she had met it. Ryan's disagreement with that conclusion does not demonstrate that the magistrate court applied the wrong legal standard.

Finally, the magistrate court's decision does not run contrary to the presumption favoring joint custody under Idaho Code section 32-717B. Ryan's argument depends on the premise that relocation would necessarily diminish his contact with the children. But the magistrate court found, based on substantial and competent evidence, that Ryan would relocate if Jennifer's request were granted. In light of that finding, the magistrate court reasonably concluded that the children would continue to have frequent and continuing contact with both parents and that the policy underlying joint custody would not be undermined.

Distilled to their essence, Ryan's arguments amount to a challenge to the magistrate court's weighing of the evidence to support its ultimate conclusion that relocation was in the children's best interests. This Court does not reweigh evidence on appeal. *Stephens v. Buell*, 175 Idaho 574, ___, 568 P.3d 471, 486 (2025). The magistrate court was faced with a difficult and close decision. It considered the relevant factors, evaluated the evidence, assessed witness credibility, and reached its decision through an exercise of reason. Although Ryan disagrees with the magistrate court's decision, he has not demonstrated that the magistrate court abused its discretion.

**B. The magistrate court's custody order does not award Jennifer unilateral decision-making authority in contravention of its order awarding the parties joint legal and physical custody of the minor children.**

In conjunction with its decision permitting relocation, the magistrate court awarded the parties joint legal and physical custody of their minor children. As to physical custody, the magistrate court ordered that, upon both parties' relocation to Florida, they "shall share custody of the children on an equal basis on a 2-2-3 schedule" and follow the detailed visitation schedule set out in the judgment. The magistrate court further ordered that, "[s]hould Ryan delay his move to Florida, he shall have custody time with the children as agreed upon by the parties." As to decisions about the children's school, the magistrate court ordered that "Jennifer shall be named primary parent for school district purposes and select the school the children attend upon relocation. Thereafter, the parties shall exercise joint custody over school selection."

On appeal, Ryan argues that the magistrate court acted beyond the outer boundaries of its discretion by crafting a custody schedule that, "[p]ractically speaking, . . . gives Jennifer complete control over Ryan's visitation with the children if he does not move to Florida," effectively depriving him of any enforceable parenting time if Jennifer does not agree to it. We do not agree. Like his earlier arguments, this contention rests on the faulty premise that the magistrate court erred in finding that Ryan would relocate to Florida. The magistrate court did not craft its custody schedule on a hypothetical; rather, it structured a detailed, equal parenting time arrangement based on its supported finding that both parties would reside in Florida. The provision allowing parenting time "as agreed upon by the parties" addresses a temporary circumstance and does not convert the joint custody award into a grant of unilateral control. To the extent Ryan is now unwilling to relocate, that reflects a change in circumstances that may be addressed through future motions; it is not a basis for concluding that the magistrate court abused its discretion at the time it entered its order.

Ryan also argues that the magistrate court exceeded the bounds of its discretion by giving Jennifer unilateral decision-making authority as to the school his children will attend upon relocation to Florida. Ryan relies on *Hess v. Hess*, 174 Idaho 524, 588 P.3d 254 (2024), to support his position, but that case in inapposite. In *Hess*, we held that the trial court abused its discretion by awarding the parents joint legal custody while at the same time giving one parent final decision-making authority on *all* matters. *Id.* at 539–40, 558 P.3d at 269–70. In so holding, we explained that Idaho Code section 32-717B(3) "defines joint legal custody as shared decision-making

concerning the health, education, and general welfare of the children." *Id.* at 540, 558 P.3d at 270. Because awarding one parent sole decision-making authority on those issues "is the opposite of this definition," we found that doing so constituted an abuse of discretion. *Id.*

Unlike the order at issue in *Hess*, the magistrate court's order in this case did not give Jennifer sole decision-making authority on all matters concerning the health, education, and general welfare of the children. To the contrary, the only decision the court delegated solely to Jennifer was the initial selection of the school the parties' children would attend upon relocation. Our cases make clear that this limited delegation of decision-making authority is permissible, as long as there is an evidentiary basis to support it. *See, e.g.*, *Wilson v. Wilson*, 174 Idaho 979, 991, 560 P.3d 1126, 1138 (2024) (rejecting argument that court abused its discretion by awarding one parent sole legal custody in areas of educational and medical decisions where the "court's decision was supported by substantial and competent evidence that sole legal custody in these areas is in the best interests of the child"). In this case, there is ample evidence from which the magistrate court could reasonably conclude that delegating the initial school selection decision to Jennifer served the children's best interests.

At trial, the parties presented conflicting positions regarding school selection in Florida. Jennifer testified that she would like the children to attend her alma mater, The Geneva School. She also presented evidence, ultimately credited by the magistrate court, that The Geneva School is comparable to the Galileo STEM Academy that RMB was attending in Idaho and would provide the children with an equally good, if not better, education. Ryan testified that he opposed enrolling the children in The Geneva School, but his position was largely tied to his concerns about Jennifer's family and his preference that the children remain in Idaho. He did not identify or present evidence of any other suitable schools the children might attend in Florida.

On this record, the magistrate court was faced with an impasse: the parties disagreed as to school selection, and there was no competing evidence of alternatives from which the court could craft a joint decision-making framework. Under these circumstances, an award of joint decision-making authority at the outset would not have resolved the dispute and instead risked leaving the children without a clear or timely school placement upon relocation. The court reasonably acted to avoid that uncertainty by assigning responsibility for the initial decision to Jennifer—as the parent who would likely relocate first—while preserving Ryan's ability to participate in school selection decisions in the future. This limited allocation of sole decision-making authority to

Jennifer is supported by substantial and competent evidence and does not constitute an abuse of discretion.

**C. Ryan has failed to demonstrate reversible error arising from the magistrate court's amendments to its original Findings of Fact and Conclusions of Law.**

The magistrate court issued its original Findings of Fact and Conclusions of Law on December 8, 2025. Approximately two weeks later, on December 23, 2025, the court issued Amended Findings of Fact and Conclusions of Law, explaining it was doing so pursuant to Idaho Rule of Family Law Procedure 805(a) "to correct the misspelling of [RMB]'s name, and several typos."

On appeal, Ryan argues that the amendments the magistrate court made to its original Findings of Fact and Conclusions of Law exceed the permissible scope of Rule 805(a), which states:

> The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice. But after an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected only with the appellate court's leave.

I.R.F.L.P. 805(a). Ryan correctly observes that, in interpreting the equivalent rule of civil procedure, Idaho Rule of Civil Procedure 60(a), this Court has limited the types of errors that may be corrected to mistakes or omissions that are "mechanical in nature" and which "do[] not involve a legal decision or judgment . . . ." *Silsby v. Kepner*, 140 Idaho 410, 411, 95 P.3d 28, 29 (2004) (quoting *Dursteler v. Dursteler*, 112 Idaho 594, 597, 733 P.2d 815, 818 (Ct. App. 1987)). More specifically, in *Silsby*, the Court adopted the Ninth Circuit's explanation that:

> [t]he basic distinction between "clerical mistakes" and mistakes that cannot be corrected pursuant to Rule 60(a) is that the former consist of "blunders in execution" whereas the latter consist of instances where the court *changes its mind*, either because it made a legal or factual mistake in making its original determination, or because on second thought it has decided to exercise its discretion in a manner different from the way it was exercised in the original determination.

*Id.* at 412, 95 P.3d at 30 (quoting *Blanton v. Anzalone*, 813 F.2d 1574, 1577 n.2 (9th Cir. 1987)).

Ryan asserts that the amendments the magistrate court made to its original findings go beyond mere clerical corrections. He identifies various textual differences between the original and amended findings and argues that the cumulative effect of those changes demonstrates the magistrate court abandoned its role as a neutral arbiter and engaged in "result-oriented fact-finding." We are not persuaded.

Even assuming, without deciding, that some of the magistrate court's amendments exceed the scope of Idaho Rule of Family Law Procedure 805(a), Ryan has failed to demonstrate any basis for reversal. Under Rule 806, this Court "must disregard all errors and defects that do not affect any party's substantial rights." I.R.F.L.P. 806; *accord* I.R.C.P. 61; *Schneider v. Schneider*, 151 Idaho 415, 427–28, 258 P.3d 350, 362–63 (2011); *Navarro v. Yonkers*, 144 Idaho 882, 887, 173 P.3d 1141, 1146 (2007). Thus, even if a magistrate court exceeds the technical bounds of Rule 805(a) in amending its findings, reversal is warranted only where the alleged error affects the outcome of the proceedings or prejudices a party's substantial rights.

Ryan has failed to make that showing here. The magistrate court's original and amended findings of fact and conclusions of law remained grounded in the same evidentiary record, the same statutory best interests framework, and the same core findings regarding the children's best interests. The amendments did not change the ultimate decision, nor did they introduce new dispositive reasoning that was absent from the original order. Instead, the magistrate court's analysis, both before and after amendment, reflects a consistent evaluation of the evidence and application of the governing legal standards.

Moreover, the specific changes Ryan identifies—whether characterized as deletions, additions, or rewording of particular findings—do not undermine the magistrate court's central conclusions. At most, they reflect refinement in the articulation of certain facts or the omission of ancillary details. Ryan's conclusory assertion that these revisions demonstrate that the magistrate court was no longer acting as a "neutral arbiter" but was instead engaging in "'result-oriented' fact-finding" is unsupported by the record. The court conducted a multi-day trial and issued detailed findings addressing the statutory best interests factors. The overwhelming continuity between the original and amended findings further undercuts any claim that the magistrate court altered its reasoning in a manner that prejudiced Ryan.

In short, even if some of the magistrate court's amendments exceeded the permissible scope of Rule 805(a), any such error was harmless under Rule 806 because it did not affect the magistrate court's ultimate decision or Ryan's substantial rights.

**D. Ryan's challenge to the magistrate court's order lifting the fourteen-day automatic stay of its relocation and custody order after Ryan filed his notice of appeal is moot.**

On December 23, 2025, the magistrate court entered its certified partial judgment awarding the parties joint legal and physical custody and permitting Jennifer to relocate with the children to Florida after January 1, 2026. On December 29, 2025, Ryan filed his motion for permission to

appeal the partial judgment directly to this Court. He also filed a notice in which he asserted that the filing of a notice of appeal triggered a fourteen-day automatic stay of the partial judgment, including the relocation provision. The magistrate court granted Ryan's motion for permissive appeal on December 30, 2025. However, it also entered an "Order Regarding Custody Pending the Appeal Directing that the Certified Partial Judgment Governs Custody, Including Relocation on January 1, 2026" (hereafter, "Order Regarding Custody Pending Appeal"). In that order, the magistrate court observed that, by its terms, the fourteen-day automatic stay provision of Idaho Appellate Rule 13(a) applies "unless otherwise ordered" by the trial court. Finding that delaying implementation of relocation would disrupt RMB's transition to a new school during winter break, the court "order[ed] otherwise," lifted the automatic stay, and directed that "the custody order, including relocation, will control until further order of a court."

Almost immediately after the magistrate court entered its December 30, 2025, orders, Ryan filed his notice of appeal and also filed a motion asking this Court to stay the relocation provision of the partial judgment. We denied Ryan's motion.

Ryan now argues that the magistrate court erred in issuing its Order Regarding Custody Pending Appeal and lifting the fourteen-day automatic stay. He contends that the magistrate court misapplied the law and failed to exercise reason in rushing the relocation rather than maintaining a stay that would have preserved the status quo. According to Ryan, "[t]he magistrate court's refusal to temporarily allow a stay of Jennifer's relocation, while also granting her the power to relocate on any date of her choosing after January 1, 2026, was an abuse of discretion and should be reversed on appeal." We decline to address Ryan's arguments because the issues he raises are moot.

"A case is considered moot when 'the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" *Mitchell v. Ramlow*, 174 Idaho 723, 726, 559 P.3d 1210, 1213 (2024) (quoting *Frantz v. Osborn*, 167 Idaho 176, 180, 468 P.3d 306, 310 (2020)). An issue "is also considered moot when a judicial determination 'would have no effect either directly or collaterally on the plaintiff, the plaintiff would be unable to obtain further relief based on the judgment and no other relief is sought in the action.'" *Id.* (quoting *Idaho Schs. for Equal Educ. Opportunity ex rel. Eikum v. Idaho State Bd. of Educ. ex rel. Mossman*, 128 Idaho 276, 282, 912 P.2d 644, 650 (1996)).

Even were we to decide that the magistrate court abused its discretion in entering the Order Regarding Custody Pending Appeal and lifting the fourteen-day automatic stay, this determination would afford Ryan no relief. The fourteen-day automatic stay was, by its nature, temporary and has long since expired by operation of law. Likewise, the challenged custody order was expressly temporary and governed only the brief period pending our determination of Ryan's motion for stay, which we ultimately denied. Because those orders no longer have any operative effect, this Court cannot grant effective relief even if error were shown. Accordingly, the issue presents no live controversy and is moot.

**E. We award Jennifer attorney fees on appeal.**

Jennifer requests attorney fees on appeal pursuant to Idaho Appellate Rule 41 and Idaho Code section 12-121. "An award of attorney fees on appeal pursuant to [Idaho Code section] 12-121 is permitted for a prevailing party when the Court determines that an appeal was brought, pursued, or defended in a manner that was frivolous, unreasonable, or without foundation." *Lamont v. Lamont*, 158 Idaho 353, 362, 347 P.3d 645, 654 (2015) (citation omitted). A prevailing party is also entitled to attorney fees under the statute "if the appeal merely invites the appellate court to second guess the trial court on the weight of evidence." *Crowley v. Critchfield*, 145 Idaho 509, 514, 181 P.3d 435, 440 (2007) (citing *Anderson v. Larsen*, 136 Idaho 402, 408, 34 P.3d 1085, 1091 (2001)).

Jennifer submits Ryan brought this appeal frivolously, unreasonably, or without foundation. We agree. Child custody and relocation disputes are left to the sound discretion of the trial court. Although this was a difficult case, the magistrate court's findings and conclusions are supported by the record and the applicable law. In large part, Ryan's arguments on appeal simply asked us to reweigh evidence and second-guess the magistrate court's findings. As a result, we award Jennifer attorney fees under section 12-121. Jennifer is also awarded costs under Idaho Appellate Rule 41.

## IV. CONCLUSION

For the foregoing reasons, we affirm the magistrate court's certified partial judgment and child custody order. Attorney fees and costs on appeal are awarded to Jennifer pursuant to Idaho Code section 12-121 and Idaho Appellate Rules 40 and 41.

Chief Justice BEVAN, and Justices MOELLER, ZAHN, and MEYER CONCUR.